McCALEB, Justice.
This suit, here for the second time, see 219 La. 1006, 54 So.2d 528, is for recovery of $31,226.62 damages allegedly resulting from a breach of a written sales contract by Harnischfeger Corporation whereby it sold to C. W. 'Greeson Company, an ordinary partnership, a large piece of machinery described as one P. & H. Model 1055 L. C. Dragline for the sum of approximately $55,000. Plaintiffs (the partnership and its individual members) originally asserted the claim against defendant corporation in a reconventional demand to a suit filed by defendant on an open account against them. This reconventional demand was voluntarily dismissed as of nonsuit by plaintiffs and reasserted by them against defendant corporation in the present litigation.
The allegations of fact upon which the cause of action is founded are that the dragline was delivered to plaintiffs in a damaged condition in violation of the warranty that it was fit for the purposes for which it was purchased; that, pursuant to the contract between the parties dated September 7, 1945, the machine was shipped by defendant from Milwaukee, Wisconsin to Bradley, Arkansas; that defendant agreed to furnish an expert operator to superintend the unloading of the machine, to track it about 9 miles from Bradley, Arkansas to the place where plaintiffs were to put it in service and also to *939 supervise its operation for 7 days; that, in accordance with its obligation, defendant sent its employee, Hank Carlton, to Bradley, Arkansas for said purpose and that, after the machine was unloaded from the railroad car on which it was shipped, defendant sent another representative from Milwaukee, Wisconsin, one Pete Bartlett, to take charge of and track it to plaintiffs’ job site where the machine was to be put in service; that, in that operation, on or about November 3 and 4, 1945, Bartlett, who was in full and exclusive charge of the machine, ran it over a steep embankment into a drainage canal 10 to 12 feet deep where it came to rest at an angle; that, in endeavoring to remove the machine on its own power from the drainage canal, the water failed to circulate in the starting motor thus overloading, burning, damaging and rendering it useless and that other parts of the machine were so badly damaged in said operation that, when it was delivered to the job site, it was unfit for the purposes for which it was manufactured, intended and purchased, the claimed defects thereof being specified by plaintiffs in detail.
To this petition, defendant filed various dilatory and peremptory pleadings including an exception of no cause of action and a plea of prescription of one year. The exception of no cause of action was grounded on the premise that defendant was not in any wise responsible for the alleged damage sustained by the machine while it was being tracked from Bradley, Arkansas to plaintiffs’ job site for the reason that the written contract, which is-the law between the parties, specifically provided that the equipment was delivered “f. o. b. cars at Milwaukee, Wis. * * and that, from that time on, the property was at the risk of plaintiffs. The basis of the plea of prescription was that, if it be conceded that defendant’s employee, Bartlett, had negligently damaged the equipment while tracking it from Bradley, Arkansas to-the job site, plaintiffs’ sole cause of action for redress of that wrong was in tort, which action was barred by the liberative prescription of one year.
In passing on these contentions of defendant in our previous decision, we concluded that, in view of the fact that plaintiffs had alleged that there were manufacturing defects in the machine known to defendant rendering it unfit when delivered for the purpose for which it was purchased, these charges were sufficient in themselves to sustain a cause of action and that, without considering the allegations relative to the damage sustained by the machine in the delivery thereof, the exception of no-cause of action would have to be overruled as a suit will not be dismissed on exceptions “where the allegations of fact set forth a right and a cause of action as to any part of the demand”. See 219 La. at page 1020, 54 So.2d at page 532.
*941 In considering the plea of prescription, we examined the written contract of the parties and, finding that there .were certain clauses contained therein [1] which seemed to be somewhat contrary to the provision that the equipment was to be delivered f. o. b. Milwaukee, Wisconsin, we deduced that the place of delivery was not fixed with certainty by the the contract. Concluding that it was not possible to determine under the circumstances presented whether the plea of one-year prescription was well founded, we referred that plea to the merits to be disposed of on the trial of the case.
Conformably with our 'judgment, the case was remanded to the lower court at which time defendant filed an answer and, later, a supplemental answer. In these pleadings, defendant admitted plaintiffs’ purchase of the dragline pursuant to the written sales contract but denied any breach thereof, alleging that it had fully complied with its obligation by delivery of the machine to plaintiffs f. o. b. Milwaukee, on or about October 22, 1945. Defendant denied that any warranty with respect to the machine was assumed by it, other than the written warranty specially set out in the sales contract, which warranty was restricted to parts of its own manufacture, and further denied that it had assumed any responsibility for the movement of the machine after it was unloaded at Bradley, Arkansas, averring that, if the machine was damaged by one of its employees while it was in the process of being moved (which defendant denied), then said employee was acting pursuant to the instructions of and under the control of plaintiffs and their superintendent rather than defendant. In addition, defendant asserted that the Diesel engine on said machine and the starting engine therefor, damage to which plaintiffs are alleging in this suit, were manufactured and supplied by the Buda Company of Harvey, Illinois; that these engines were not warranted by defendant nor did it ever assume responsibility for any repairs to or replacement thereof; that, after the machine had been used continuously by plaintiffs from October, 1945 to the middle of February, 1946, the bearings in the Diesel engine burned out due to causes beyond defendant’s knowledge but for which it was not responsible; that all work and repairs on said Diesel engine and starting engine were made by the Buda Company and that defendant never assumed any responsibility with respect thereto, other than to refer plaintiffs to the manufacturer thereof.
On the issues thus formed by the pleadings, the case proceeded to trial at which *943 voluminous testimony was taken comprising almost 1000 pages of the transcript. The greater part of this evidence is irrelevant and opposing counsel agree that much of it has no probative value with respect to the issues presented for determination.
Stripped of the many claims and counterclaims that have been made in this litigation, it will be seen from the foregoing statement of the case that the principal issue for decision is whether the damage complained of by plaintiffs was occasioned while defendant was performing an obligation imposed upon it by the contract with respect to the delivery of the machine or whether the damage resulted after delivery had taken place and the machine was under the control of plaintiffs.
In considering this question, it is pertinent to initially observe that we are assuming, for the purpose of this discussion (notwithstanding that the evidence is far from convincing), that the dragline was damaged, at least to some extent, when it partially slipped over the side of the drainage ditch which it was required to negotiate when it was being tracked from the station at Bradley, Arkansas to plaintiffs’ job site some 9 miles away. Further, it is to be noted that the contract herein specifically excludes all warranties except the special warranty given by defendant as to parts, machinery, tools or equipment of its own manufacture and it is not now contended, nor is it shown by the evidence, that any part of the drag-line sustained damage in the drainage ditch accident, other than the starting motor (which was replaced by Buda Company on December 27, 1945) and the Diesel engine (which was also the product of Buda Company). Hence, it is manifest that, but for one other provision in the contract to which we shall later advert, the all-important issue is the place where delivery of the machine was effected as that was the place where plaintiffs assumed the risk of loss. See Articles 2467 and 2468 of the Civil Code.
The written contract specifically provides that the place of delivery is “f. o. b. cars at Milwaukee, Wis.” The general rule is that when goods are delivered “free on board” pursuant to contract, the presumption is that the property passes thereupon.[2] See Williston on Sales (Rev.ed., 1948) Vol. 2, Sec. 280(b) and Swift Canadian Co. v. Banet, 3 Cir., 1955, 224 F.2d 36. But this rule is inapplicable to this case because we have heretofore held that, due to other provisions in the sales contract, the place of delivery is not fixed with certainty in the agreement and that parol evi *945 dence was necessary in order to ascertain the true intent of the parties. The plaintiffs contend that the place of delivery was its job site, 9 miles from Bradley, Arkansas and the defendant asserts that, in accordance with the contract, the place of delivery was Milwaukee, Wisconsin.
To support its position, plaintiffs submitted testimony by one Lee M. Cauble, who was a salesman in the employ of defendant at its Memphis, Tennessee office during the time that the sale of the drag-line was being negotiated, and the evidence of Messrs P. D. Holley, A. Breitling and C. W. Greeson, of plaintiff partnership, who confirmed Mr. Cauble’s statement that he represented to them that the machine would be shipped and delivered by the defendant to the job site near Bradley, Arkansas.
Since all of the purported representations made by Cauble to plaintiffs respecting the place of delivery occurred prior to the confection of the contract, defendant contends that they were not only unauthorized but without legal effect and, in this claim, it relies in part on the Ninth paragraph of the written contract providing that the agreement shall not become effective until accepted, executed and approved in writing by certain named officers of defendant at its office in Milwaukee, Wisconsin and, further, that “ * * * you represent that this contract sets out all agreements concerning this transaction, and agree that all prior writings, verbal negotiations, understandings, representations, warranties, conditions, or agreements upon which you may rely, but which are not herein expressed, shall not be binding; that this agreement shall not at any time be modified except in writing executed by you and executed and approved by one of our aforesaid officers”. '
It seems clear that the foregoing provision of the contract effectually nullifies any previous understandings between Mr. Cauble, as salesman for defendant, and the representatives of plaintiff partnership, particularly as it is shown that Cauble was never authorized before, at the time of or since the confection of the contract to bind the defendant. The written proposal was submitted through defendant’s Memphis office to plaintiffs and the latter accepted it on September 7, 1945 without any changes whatsoever and it was finally approved by defendant corporation on October 11, 1945, at which time it became a binding and executory contract. It appears that at no time prior to the confection of the contract were the officers of defendant or its responsible agents advised of the alleged representations of Cauble concerning delivery at the job site. Mr. R. M. Calkins, defendant’s District Manager at Memphis (Cauble’s immediate superior), testified that he knew nothing of any verbal agreement to deliver the dragline to the job site either from Cauble or anyone connected with the *947 plaintiff partnership. It is shown that, on September 27, 1945, Calkins sent a letter to Mr. C. W. Greeson confirming the order for the dragline and, in a postscript thereto, Calkins requested that he be advised of “the rail point to which you want this machine shipped, and also give us the wording of the sign which you desire painted on the cab of the machine”. (Emphasis ours.) In his reply of October 4, 1945, Mr. Greeson states, among other things, “Please ship this machine to Bradley, Ark.” If he had understood that the place of delivery was to-be the job site, some nine miles distant from Bradley, it would appear that this would have been an opportune time for Mr. Greeson to make known his intention and understanding.
It is thus manifest that plaintiffs have fallen far short of exhibiting with any reasonable certainty an agreement for delivery of the machine at the job site. Not only is there nothing in writing to substantiate this contention, but we think that the prior action of the parties discloses that neither one nor the other believed that defendant would undertake the risk of tracking this large, cumbersome and complicated piece of machinery weighing approximately 200,000 pounds over unknown terrain in the absence of a clear written agreement to do so whereby the purchaser would undertake the added expense attendant to such a movement. Indeed, it is shown that the responsible agents of defendant corporation had no knowledge as to the location of the job site.
Judging all of the testimony given on the question of delivery in connection with the written agreement of the parties, we are satisfied that the intended place of delivery was f. o. b. Milwaukee, Wisconsin, as stated in the contract. However, there is another factor which must be considered in determining the important question of delivery, this being the form of the bill of lading.
It appears from the record that the drag-line excavator was consigned to the order of defendant, the bill of lading covering the shipment being a “Shipper’s Order Notify” or negotiable bill of lading. This bill of lading and defendant’s sight draft for the unpaid purchase price were sent to the Bossier Bank and Trust Company of Bossier City, Louisiana, where, on October 25, 1945 (prior to the arrival of the dragline in Bradley, Arkansas), plaintiffs paid the draft and received the bill of lading.
Section 40(b) of the Uniform Bills of Lading Act (Act 94 of 1912), now R.S. 45:940(2), states that:
“Where by the bill the goods are deliverable to the seller or to his agent, or to the order of the seller or of his agent, the seller thereby reserves the property in the goods. But if, except for the form of the bill, the property would have passed to the buyer on *949 shipment of the goods, the seller’s property in the goods shall be deemed to be only for the purpose of securing performance by the buyer of his obligations under the contract.”
Prompted by a reluctance to countenance any sort of splitting of the incidents of ownership, our courts have construed this provision to mean that, where goods delivered f. o. b. to a carrier are consigned to the vendor, risk of loss remains in said vendor during transit unless there is an express agreement between the parties that the risk is assumed by the vendee upon delivery to the carrier. Gerde-Newman & Co. v. Louisiana Stores, La.App., 144 So. 756; see California Fruit Exchange v. John Meyer, Inc., 166 La. 9, 116 So. 575.[3]
Accordingly, we are convinced that the risk of loss passed from defendant to plaintiffs, at the very latest, immediately following the arrival of the machine in Bradley, Arkansas when it was unloaded and assembled under the supervision of defendant’s employee. It was at this juncture, if not before, that the dragline was delivered to plaintiffs.
In view of this conclusion, plaintiffs’ case must fail as the dragline was its property and at its risk during its movement from Bradley, Arkansas to the job site. In connection with the movement of the machine to the job site, we take note of paragraph 6 of the written contract under which defendant agreed that “An expert operator will be furnished to superintend unloading and starting the machine in operation for a period of 7 days”. Plaintiffs’ counsel maintain that this provision sustains their position that delivery was not effected until after the machine was brought to the job site or until such time as its operation was under the sole control of plaintiffs’ agents and employees.
We do not agree with this construction of the contract. In the first place, the provision has nothing whatever to1 do with the question of delivery of the machine to the purchaser. It simply obligates the seller to have an expert on hand to superintend the unloading of the heavy and complicated equipment, to reassemble it, start the machine in operation and, generally, to instruct the personnel of the purchaser in its operation and care.[4] This service was *951 available at the expense of defendant for a period of 7 days.
In the instant case, defendant fully complied with this obligation, first sending Mr. Carlton from its office at Memphis, Tennessee to Bradley, Arkansas to unload the machine where he was relieved a day or two later by Pete Bartlett, who was sent from the home office. The equipment was unloaded, the machine assembled and placed in operation for plaintiffs’ use within three to four days after its arrival at Bradley, Arkansas where delivery was complete. The fact that Mr. Bartlett consented to track the machine from Bradley to the job site and that the machine was allegedly damaged during this operation avail plaintiffs nothing for, insofar as he participated in moving this machine to the job site, Bartlett was unquestionably acting under the instruction and control of plaintiffs and not of defendant. In other words, we are convinced that, to the extent that he assisted in tracking the dragline from Bradley, Arkansas, Bartlett was a borrowed employee of plaintiffs and, consequently, defendant is not liable for any damage to the machine that might have been caused by Bartlett in this capacity. See B & G Crane Service v. Thomas W. Hooley & Sons, 227 La. 677, 80 So.2d 369 and cases there cited.
In determining the place of delivery, we have already discussed defendant’s contractual obligation with respect to this machine after its arrival in Bradley, Arkansas, i.e., “to superintend unloading and starting the machine in operation for a period of 7 days”, and have concluded that this provision did not require or even contemplate that defendant would be responsible for moving the dragline to the job site. It is Bartlett’s testimony that he had no instructions from defendant to move the dragline anywhere and that he was requested to help track it the 9 miles to the job site by Mr. Keene, plaintiffs’ superintendent, the latter supervising the general operation and selecting the route to be taken. We find this testimony highly credible and in accord with the reasonable probabilities of the situation. Indeed, it was not contradicted as Mr. Keene was not called by plaintiffs as a witness.[5]
*953 Hence, even were we to assume that Bartlett was guilty of some sort of negligence in his participation in the movement of the machine from Bradley, Arkansas to the job site (a generous assumption from our appreciation of the record) and that the machine was damaged as a result thereof (which is also a matter of considerable doubt), defendant would not be liable ex contractu, having performed all its obligations under the contract.
The judgment appealed from is affirmed.

. The provisions referred to were those in' which the plaintiffs were requested by an amendment to the original contract to advise the rail point to which it wished the machine shipped and another provision declaring that “an expert operator will be furnished to superintend unloading and starting the machine in opera-s tion for a period of 7 days”.

. Of course, under Louisiana law, the sale is perfect, as between the parties, “as soon as there exists an agreement for the object and for the price thereof, although the object has not yet been delivered, nor the price paid.” Article 2456 of the Civil Code.

. It is evident from a reading of .the cases construing the Uniform Bills .of Lading Act that the courts of this state ar.e of the opinion that that statute has modified Article 2456 of the Oivil Gode with respect to the passing of title from vendor to purchaser when the subject of the sale is consigned to the vendor under a bill of lading. See State v. Federal Sales Co., 172 La. 921, 136 So. 4.

. This is the testimony of Mr. Eric L. Nelson, the general service manager of defendant, as to the duties of Bartlett, the service engineer, which is corroborated by Bartlett himself. This evidence, we . think, represents a fair interpretation of the promise of defendant, as set forth in paragraph Six .of the contract.

. Plaintiffs did produce as a witness an employee named M. H. Weems who was on the dragline as an oiler during the trip from Bradley to the job site. Weems, who testified at some length as to the cause and effect of the drainage ditch accident, attributed to Bartlett the remark: “this machine belongs to the P. & H. people (i. e., defendant) until I put it in the job”. (Words in parenthesis ours.) Bartlett flatly denied having made this statement and, without imputing any improper motives to Mr. Weems, we are not inclined to give his testimony much weight in view of his fantastic and obviously exaggerated account of the accident and the events immediately preceding and following it. For example, in describing conditions in the dragline’s cab after the accident, Weems testified that:
*953 “When the light plant went out, the motor was so hot until you could just see everything in the back end of the cab by the heat of the motor. The manifold and everything was so red it was just like you had a lamp lit back there. (Laughter) That’s just the way it was, and I wouldn’t say nothing wrong in this Court.”