CULPEPPER, Judge.
This is a suit for damages for personal injuries. Defendant’s tank truck was unloading creosote when a hose pulled loose and sprayed plaintiff with creosote, allegedly causing cataracts in his eyes. The district judge awarded plaintiff $52,814.83. Defendant appealed. Plaintiff answered the appeal, seeking an increase in the award.
The essential issues are: (1) Was Bur-nell Ardoin, who closed a valve, while the pump was still operating, and caused the hose to pull loose, a borrowed servant of defendant ? (2) Did the creosote cause the cataracts in plaintiff’s eyes? (3) Is the award excessive or inadequate?
The facts show that Reddell Creosote Company is in the business of treating pine posts, etc. with creosote. Reddell contracted with the defendant, Hearin Tank Lines, to haul creosote from Baton Rouge to Red-dell’s 20-acre plant site near Reddell, Louisiana.
On the day in question, November 15, 1962, one of Hearin’s trucks arrived and parked 12 or 15 feet from Reddell’s large storage tank. A pump is mounted on the right-hand side of the truck, just below and to the rear of the cab. This pump is run by the truck’s engine.
The unloading procedure consists of connecting-pieces of hose, which are part of the truck’s equipment, from the truck’s tank *792 to the pump and from the pump to Reddell’s storage tank; valves at the pump and at the storage tank are opened; the truck’s engine is started and it takes about 45 minutes to completely unload.
The driver can unload his truck alone, but if a man is available, Reddell sends him to assist. On this particular occasion, Red-dell sent Burnell Ardoin, with instructions to assist the truck driver in any way requested. Ardoin had never done this before. There is some question as to whether Ardoin actually assisted in hooking up the hoses, but it is clear that after the pumping started, Ardoin stood by the cut-off valve at Reddell’s storage tank to await instructions from the truck driver as to when to close it. The truck driver either stood near the pump, or sat in the right-hand side of the cab with the door open, while the pumping proceeded.
While this unloading was in progress, the plaintiff, Rovelia Young, a delivery truck driver for Reddell, returned to the plant and reported to the manager, Mr. Horace Ardoin. Since there was no work to which Young could be assigned in the short interval before lunch time, the plant manager instructed Young to go see if any help was needed in unloading the tank truck. Young went and stood between the truck and the storage tank watching the pumping operation.
When the truck tank was almost empty, the pump began to “suck air” and the engine started “changing tune” or “racing”. The driver left his position near the pump and went around to the driver’s side of the cab, where he adjusted the throttle to idle the truck motor. As he returned, or after he had returned, to his position near the pump, he shouted, over the noise of the pump and motor, either the words “empty” or “almost empty”. Burnell Ardoin mistook this as a signal to close the valve at the storage tank, even though the pump was still operating. When Burnell Ardoin shut the valve, the increased pressure caused the rubber hose from the pump to the storage tank to pull away from its metal coupling, at the pump. Creosote, under pressure, was sprayed from both the pump and the hose into plaintiff’s face, covering him from head to foot.
Under these facts, the district judge held the truck driver was negligent in shouting to Burnell Ardoin, over the noise of the pump and engine, that the truck was empty, or almost empty, causing Ardoin to understand that he should close the valve. The trial judge also found the truck driver negligent in that he saw or should have seen Ardoin closing the valve in time to stop him. The valve was of a wheel-type which took 10 or 11 turns, and about 10 seconds, to close. Furthermore, the district judge found that Hearin’s equipment was defective in that it was not so constructed that the hose could withstand the pressure, and there was no by-pass hose back to the truck’s tank to serve as a safety device. The lower court found it unnecessary to rule on plaintiff’s additional arguments that the doctrine of res ipsa loquitur is applicable and that Ardoin was a borrowed servant of Hearin. But, the court did state both of these arguments had merit.
We prefer to base Hearin’s liability on the conclusion that Burnell Ardoin was its borrowed servant, for whose negligence it is liable. It is clear that Ardoin was negligent in closing the value without being instructed to do so and in not foreseeing the danger of closing the valve while the pump was still operating. Guidelines for deciding the borrowed servant issue have been established by our Supreme Court in the landmark case of Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951). In that case an oil well drilling company contracted with a welding company to repair a rig for a consideration of $5.50 per hour of the time of the welders. The welding crew went to the job site where they were instructed as to what to weld. One of the welders caused a fuel tank to explode, injuring plaintiff. Under these facts the court held that the welder remained the *793 employee of the welding company and did not become the borrowed servant of the drilling company. In the course of its opinion, the court pointed out that the two general tests of the borrowed servant doctrine are: (1) Whose business was the employee engaged in and (2) Who had authoritative control of the employee. The court pointed out that either test, used alone, is not infallible, but said: “Where, however, it is clear that control by the defendant was coupled with performance for the defendant and in the defendant’s business, the result is certain.”
In the Benoit case the court held that the welder was performing work which was part of the business of the welding company and that although the drilling company had pointed out the welding to be done, this did not constitute a change of control, i. e., it did not constitute “authoritative direction and control but was merely suggestion as to details and constituted necessary cooperation in the work being furnished in the larger undertaking.”
In the recent case of Hebert v. Hartford Accident & Indemnity Co., La.App., 140 So.2d 755 (3rd Cir. 1962) a road construction company furnished its bulldozer and operator to the State Police to clear highways in Cameron Parish following Hurricane Audrey. Plaintiff’s boat was pushed from the highway and damaged. We held the bulldozer operator was a borrowed servant of the State Police. He was engaged in the business of the State Police, not the business of the road contractor, and he was under the authoritative control of the State Police as to where, when and how to clear the highways.
In Benoit v. Hunt Tool Co., supra, the court discusses, as follows, Denton v. Yazoo & Mississippi Valley Railroad Co., et al., 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310, a case apparently very similar to the one at bar:
“ * * * the pla-intiff was injured by a general employee of the railroad, who at the time was engaged in loading United States mail into a mail car under the direction of a United States postal transfer clerk. The court found that the negligent employee was under the control of the government and that the work he was doing was that of the government. After reviewing numerous cases cited by petitioner, the court said: ‘In each of these cases, the facts plainly demonstrated that the work was that of the general master, and that in doing it, the servant had not passed under the direction and control of the person for whom the immediate work was being done; the latter being looked to not for commands, but for information. * * * ’ ”
In C. W. Greeson Co. v. Harnischfeger Corp., 231 La. 934, 93 So.2d 221 (1957) the plaintiff purchased from defendant a large dragline to be delivered in Arkansas. An employee of defendant unloaded and assembled the dragline, but then, on the purchaser’s request, he was driving the drag-line to a job site when the machine was damaged. The court held the operator was a borrowed servant of the purchaser, i. e., that he was engaged in the business of the purchaser and was under its control.
Under these decisions, we think it is clear that Burnell Ardoin was a borrowed servant of Hearin Tank Lines. The unloading of the tank truck was the business of Hear-in, this being the responsibility of the truck driver. Furthermore, Reddell’s instructions to Burnell Ardoin were to assist the truck driver in any way requested. The truck driver accepted this assistance and he, being the only one who knew the unloading procedure, assumed full authoritative direction and control over Ardoin.
The next issue is whether plaintiff’s principal injury, which was the formation of cataracts in both eyes, requiring surgical removal of the lenses and resulting in serious permanent impairment of vision, was caused by the' accident.
*794 As stated above, plaintiff was standing between the truck and the storage tank when the hose pulled out of its coupling at the pump, causing creosote to be sprayed under pressure into plaintiff’s face. The creosote was in plaintiff’s eyes, nose, mouth, ears and generally all over his body. He was immediately laid under a water faucet to wash off as much of the creosote as possible. After about an hour he was able to open his eyes. He went home and changed clothes and returned to work, but his eyes remained red. The next day his skin began to peel, as if from sunburn.
Except for the redness of the eyes, his vision did not appear to be affected until about six weeks after the accident, he was trying to look up a telephone number at his employer’s plant and noticed that he couldn’t read the words. His vision then rapidly became worse.
On March 9, 1963, plaintiff went to Dr. R. V. St. Divier, an ophthalmologist in Lafayette. He found plaintiff had bilateral posterior sub-capsular cataracts, but he did not think there was any causal connection between the cataracts and the creosote accident.
Plaintiff’s vision continued to worsen and on March 29, 1963 he went to see Dr. Phillip W. LaHaye, an ophthalmologist in Eunice. Dr. LaHaye found the cataracts and thereafter was plaintiff’s attending physician. He thought it was possible that the cataracts were caused by the creosote accident, and so reported to Reddell, whose insurer started paying workmen’s compensation benefits to plaintiff.
In April of 1963, Dr. George PI. Jones, an ophthalmologist from Baton Rouge, who performs eye surgery, was seeing patients in Dr. LaHaye’s office in Eunice and examined plaintiff. Both doctors were of the opinion that surgical removal of the lenses would eventually be necessary and hence they continued to follow the case. By January of 1964 the cataracts had matured to the point that plaintiff was practically blind in both eyes. On March 6, 1964, a lense extraction was performed on plaintiff’s left eye by Dr. Jones, assisted by Dr. LaHaye, at the hospital in Mamou, Louisiana. A similar operation was performed on the right eye on June 20, 1964.
At the time of the trial, October 13, 1964, plaintiff had already been fitted with special cataract glasses for the left eye and it was anticipated that within a few months a similar corrective lense would be made for the right eye. These corrective lenses will correct plaintiff’s vision to about 20-25. But, the expert medical testimony is to the effect that he will have “tunnel vision”, i. e., a considerable loss of peripheral vision in both eyes. Furthermore, due to the loss of the natural lenses in the eyes, and their light-filtering abilities, plaintiff will be very susceptible to the effects of glare from the sun or bright lights. Also, his vision will be distorted, i. e., objects will appear much larger than natural size.
The expert medical witnesses for both plaintiff and defendant are in general' agreement that the phenol substance in creosote can cause cataracts. These doctors said the medical literature relates many case histories of patients who developed cataracts after orally taking drugs containing phenol over a period of time. But, defendant’s doctors say the creosote could not have penetrated the outside of plaintiff’s eyes and reached the lenses without burning and leaving scars and damage to-the outsides of the eyes. No doctor found such scars. On the other hand, plaintiff’s doctors say the creosote could have penetrated to the lenses without leaving outside scarring.
Both Dr. LaHaye and Dr. Jones expressed the considered opinion that as a result of the accident creosote penetrated through the outsides of the eyes to the lenses. There the phenol substances in the creosote altered the metabolism, or use of oxygen by the lenses, thereby causing them to become cloudy or opaque. Dr. Jones quoted most *795 persuasively from a standard textbook of ■ophthalmologjq Textbook of Ophthalmolo•gy, Vol. 6, Injuries, by Stewart Duke— Elder, which relates may case histories and ■experiments, where phenol in the bloodstream caused cataracts in both man and .animals.
In addition to Dr. LaHaye and Dr. Jones, plaintiff relies on the testimony of Dr. Merrick Wyble, an ophthalmologist in ■Opelousas, who examined plaintiff on July 24, 1963. Dr. Wyble was a very ■cautious witness. He stated that he was not sure of the exact chemical components ■of creosote, but he did know from the •above mentioned standard textbook and ■other literature that certain phenol substances, when taken orally, or entering the bloodstream in some way, could cause cataracts in some individuals. He further stated that if other possible causes, such as diabetes or inflammatory diseases of the eyes, could be ruled out, as they were in this case, and if plaintiff had perfect vision ■before the accident, it would be most un-iisual for the cataracts to progress as rapidly as they did without stimulation from ■some toxic products, which could have reached the lenses as a result of this accident.
Defendant introduced the testimony of three ophthalmologists who expressed the ■opinion that the creosote accident did not cause the cataracts. Dr. Phillip Laborde, ■of Alexandria, examined plaintiff six months after the accident; Dr. Robert E. Schoel, of New Orleans, examined plaintiff sixteen months after the accident; and Dr. R. V. St. Divier, of Lafayette, as noted above, examined plaintiff about six weeks after the accident. The essence of the testimony of these three expert medical witnesses is that the creosote could not have penetrated to the lenses of the eyes, which are beneath the cornea, without leaving some external scarring or damage.
We agree with the trial judge that this conflict between two bodies of respectable expert medical opinion must be resolved in plaintiff’s favor. At the outset, we note that a few weeks before the accident plaintiff’s eyes were examined for a driver’s license, and his, vision was 20-20 in both eyes. In Normand v. Bankers Fidelity Life Ins. Co., 148 So.2d 154 (3rd Cir. 1962) we stated the general rule that:
“A medical condition producing disability or death is presumed to have resulted from an accident, if before the accident the injured person was in good health or affected only with latent symptoms, but shortly after the accident the disabling or death-causing condition manifested itself; provided that the medical evidence shows that there is a reasonable possibility of a causal connection between the accident and the disability or death.” (citations omitted)
Furthermore, Dr. LaHaye was the treating physician and Dr. Jones was the surgeon who removed the lenses from plaintiff’s eyes. Both of these doctors saw plaintiff on many more occasions, apparently researched the medical literature more thoroughly and gave more careful consideration to the cause of these cataracts, than did the defendant’s medical witnesses who saw plaintiff on only one or two occasions.
The next issue is the quantum of damages. The award of $52,814.83 consists of (1) $45,000 in general damages for physical pain and suffering, mental anguish, a period of about 1 year of almost total blindness, permanent loss of and distortion of vision, future medical expenses and loss of future earnings; (2) $6,370 for actual loss of wages and (3) $1,444.83 for medical expenses already incurred.
One of the principal items of damage is the loss of future earnings. The evidence shows that at the time of the accident, plaintiff was 41 years of age and had previously worked as a roughneck for an oil company, as a truck driver, and with *796 a seismograph crew, earning about $4,000 to $7,800 a year. We think the medical testimony shows that plaintiff will now be unable to work as a truck driver or as a roughneck or in any similar job around dangerous machinery. Not only are his eyes abnormally affected by glare, but the lack of peripheral vision would be an undue hazard. Plaintiff has only a ninth grade education and undoubtedly will suffer a considerable loss in earnings. At the time of the trial he was working only as a bartender.
Defendant has cited: Johnson v. Louisiana Coca-Cola Bottling Co., La.App., 63 So.2d 459, where an employee of an electrical supply company, with a life expectancy of 40 years, was awarded $12,500 for the complete loss of his left eye, but the opinion is not clear as to what consideration was given to loss of future earnings; Kennedy v. Frierson, La.App., 142 So.2d 838, in which a 24 year old man was awarded $5,000 for damage to one eye, reducing his vision to 20-40, correctible with glasses; and Johnson v. Pickering Land & Lumber Co., 132 La. 425, 61 So.2d 514 in which a minor who lost an eye was awarded $6,000.
We agree with counsel for the plaintiff that the loss of one eye is not as disabling, nor perhaps does it cause as much physical pain and mental anguish as plaintiff’s loss of the lenses in both eyes. A man left with one good eye can function fairly well, but a man like the plaintiff, who can’t see anything without glasses, and who has to wear very thick special cataract glasses, referred to by one of the doctors as “milk bottle bottoms”, and who will be highly sensitive to glare, and have only “tunnel vision”, will be very seriously handicapped in his work and in his personal pursuits for the rest of his life.
Counsel have not cited any cases where the damage was to both eyes, but our attention is called to Pierrotti v. La. Department of Highways, 146 So.2d 455, La.App. (3rd Cir. 1962) where plaintiff lost his ability to speak and this court approved a total award by the trial court in the sum of $50,000. The facts showed that plaintiff was a 23 year old man whose larynx was pierced, causing permanent paralysis of the vocal cords, permanent difficulty in breathing and loss of earning capacity as a barber.
Under all of the circumstances, and in view of the “much discretion” allowed the trial court as to the amounts of awards, Gaspard v. LeMaire, 245 La. 239, 158 So. 2d 149; Ballard v. National Indemnity Company, 246 La. 963, 169 So.2d 64 (1964), we do not find this award to be an abuse of the trial judge’s discretion.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendants.
Affirmed.