100 So.2d 242 (1958)
Mrs. Lillie E. MALLOY and Will C. Malloy, Plaintiffs-Appellants,
v.
BUCKNER-HARMON WOOD CONTRACTORS, et al., Defendants-Appellees.
No. 8779.
Court of Appeal of Louisiana, Second Circuit.
January 21, 1958.
Rehearing Denied February 13, 1958.
Writ of Certiorari Denied April 21, 1958.
*243 Booth, Lockard, Jack & Pleasant, Shreveport, for appellants.
Meadors, Shaw & Meadors, Homer, for appellees.
HARDY, Judge.
This is an action in tort by plaintiffs, husband and wife, who seek to recover damages for personal injuries, etc., resulting from an automobile collision between a Chevrolet sedan owned and operated by plaintiff husband, in which plaintiff wife was a guest passenger, and a pulpwood truck owned by Cedric Burns and driven by his employee, Calvin Morgan. Made defendants, in addition to the above named owner and driver of the truck, were the partnership known as Buckner-Harmon Wood Contractors, the individual partners and their liability insurer, Canal Insurance Company, under plaintiffs' allegations that both Burns and Morgan were employees of the partnership, acting at the time of the accident in the course and scope of their employment.
The defendant partnership and its individual partners interposed an exception of *244 no cause or right of action, particularly predicated upon the factual allegations in the exception that Burns and Morgan were not employed by exceptors. A separate, but identical, exception was filed on behalf of the defendant, Canal Insurance Company.
Trial was had on the exception of no right of action, following which there was judgment sustaining the exception of no cause or right of action and dismissing plaintiffs' suit. From this judgment plaintiffs have appealed.
In the beginning it should be observed that the judgment, insofar as it sustains the exception of no cause of action, is unquestionably in error. The only issue involved by the pleadings and tendered for consideration on this appeal concerns plaintiffs' right of action, which, in turn, must depend upon a resolution of the issue as to the relationship between Burns and the partnership. On the basis of his appreciation of the facts adduced on trial of the exception and the jurisprudence applicable thereto, our learned brother of the district court reached the conclusion that Burns was an independent contractor, for whose torts the defendant partnership was not liable to third persons. This is the proposition which we are called upon to review upon this appeal.
In support of their exception defendants urge that Cedric Burns was an independent contractor engaged in cutting, hauling and loading pulpwood for the defendant partnership under the terms and conditions of an oral contract between the said parties.
To the contrary, plaintiffs contend that Burns was nothing more nor less than an employee of the defendant partnership, whose operations were subject to complete right of control of the partnership as his employer.
The pertinent facts established on trial of the exception show that Burns owned two pulpwood hauling trucks, one being the vehicle involved in this accident, which he had purchased only a few months prior to the occurrence thereof; that Burns employed some sixteen laborers as drivers, woodcutters and loaders; that, under an oral agreement between Burns and the Buckner-Harmon partnership, the former received $8 per cord for wood cut, hauled and loaded on railroad cars as directed by the partnership; that at the time of the occurrence of the accident Burns was engaged in cutting, loading and hauling pulpwood from a tract of burned-over timber which had been purchased by Buckner-Harmon; that Burns had been shown the lines of the tract upon which the purchased timber was located and had been instructed to cut and haul it to railroad cars either at Standpipe or Homer; that Burns was paid $8 per cord for wood cut, hauled and loaded as directed; that Burns' operations were subject to supervision and direction by the members of the partnership and its foreman or woods boss; that bookkeeping details of Burns' operations were kept by the partnership, and social security payments, compensation insurance premiums and weekly charges for the expense of keeping books were charged against Burns' weekly compensation, at the stipulated price computed on tallies of wood delivered to the railway cars; that the partnership issued a weekly check to Burns, representing the amount due for wood cut and delivered less the above charges, together with his account for gasoline, repairs or supplies incurred in accounts with a filling station, garage and saw company, all operated by the partnership; that Burns' usual custom was to cash the check and pay his employees, whose time he kept himself and who were paid at the rate of seventy-five cents per pen, in connection with which fact we parenthetically
observe that four pens are equivalent to one cord; that at the time of the accident, and for some four to five years prior thereto, Burns worked exclusively for the Buckner-Harmon partnership; that subsequent to the accident Burns' truck, which had been involved therein, was repossessed for non-payment of purchase installments and subsequently sold by the repossessing dealer to the Buckner-Harmon partnership.
*245 Aside from the above facts bearing directly upon the relationship between Burns and the partnership, it was established that the latter owned a number of trucks, which apparently it employed in logging operations, and which vehicles were covered under a fleet insurance liability policy; that the partnership did not engage in pulpwood hauling operations with its own trucks but preferred to conduct these operations through some fifteen or sixteen independent truck owners, as was the case with Cedric Burns, and it is contended that these vehicles were covered by liability insurance under the fleet policy above referred to through a non-ownership endorsement thereupon.
We think it desirable to elaborate to some extent upon the details of the arrangements between the partnership and its pulpwood haulers, which, we think, can be accomplished by quotation of the following extracts from the testimony of Mr. Ralph L. Harmon, one of the members of the partnership, as follows:
"Q. Let me ask you this: Generally, with your crews, is it customary to allocate a certain area for each crew? A. No; ordinarily, the way we did that, Mr. Meadors, we would go show them the lines and, of course, tell them the size which we bought it to; and ordinarily, we didn't have any trouble with them abiding by the agreement that we had made with the land owner.
"Q. What I'm talking about, in case you have more than one crew cutting on one particular tract of land, do you normally allocate a certain area to each of the contractors? A. Yes, it's necessary to do that.
"Q. And why is that necessary? A. Well, if you didn't do it, one thing, it causes confusion among the cutters where they are cutting by the pen. You know, one bunch will get over here on this boy's place, on this area, and he will cut some over there, and the next thing you know you just have confusion, where there are two or three different crews working. So it is necessary to have different spots to cut."
* * * * * *
"Q. Did you ever have occasion to direct Cedric Burns, or any of the other Negroes in his same class that owned their own trucks, did you ever have occasion to direct them to jump from one tract to another? If you had a contract on a particular tract that had to be cut within a specified period of time, did you ever have to do that? A. Possibly; but I don't recall.
"Q. I mean, once they start one tract, youA. We try to complete that tract.
"Q. You try to? A. Yes.
"Q. But in case you didn't have enough men to go to another tract that the timber had to be on that other tract within a certain length of time, then you reserved the right to tell Cedric to move over to that other tract, didn't you? A. Oh, yes, I had the right to tell him, but
"Q. You could tell him that? A. we would try to arrange that to where we would know how much time we had on it.
"Q. What I'm getting at, you controlled that; you and the other partners controlled that; Cedric didn't have any control over that? A. Where he was cutting the timber, we were responsible for it."
From the above, and other testimony along the same line, certain factual conclusions are inescapable. The partnership retained a complete right of control over Burns' operations. It is not open to question that the partnership controlled the designation of timber to be cut, the size thereof and the place of loading. It is clear from the above quoted testimony that the partnership, at will, could have directed Burns to cease operations on one tract and ordered *246 him to begin operations on another, switching these operations from place to place, as best suited the convenience of the partnership. It is also implicit in the testimony that Burns could have terminated his operations at any time, and, apparently, that he was free to cut and haul as little or as much pulpwood as he might choose without regard to any binding contractual agreement as to limitations of amount or time.
The job upon which Burns was engaged at the time of the occurrence of the accident, which is the basis of this suit, is not shown by any of the testimony to have been separate and distinct from any other work in which he had been engaged for the defendant partnership over a period of four or five years. There is no evidence which would indicate, even by implication, that Burns worked from contract to contract and that he finished one undertaking for which he contracted before proceeding to another. On the contrary, the clear inference from the testimony of the witnesses on this point is that Burns worked on whatever job he was directed by the members of the partnership or its superintendent, all of whom, as Burns himself testified, were his "bosses." It is equally clear that the assignment of Burns to the particular tract upon which he was working in this instance was made by the defendant partnership purely as a matter of convenience, not of contract, and, according to the testimony of one of the partners, was done for the purpose of avoiding confusion between the members of the operating crews.
Upon the basis of the established facts as above summarized, we are required to make a determination as to whether Cedric Burns should have been considered an employee or an independent contractor.
The question posed in this case is one which has caused considerable concern to our courts over a long period of time. The importance of this particular point has most frequently been manifest in connection with the ascertainment of rights and liabilities under the Louisiana Workmen's Compensation Statute, LSA-R.S. 23:1021 et seq., which have depended upon the definition of "employee" as contradistinguished from "independent contractor." The legislature, through amendments in 1926 and again in 1948, attempted to dispel the difficulty and confusion which existed in a vast body of case law by defining the term "independent contractor."
The pertinent provision of the 1926 amendment to the Workmen's Compensation Statute (Act 85 of 1926, Section 3, Paragraph 8) attempted to expressly define the term "independent contractor." Despite this legislative attempt at clarification of the problem of definition, subsequent jurisprudence again became involved in some confusion in the effort at distinction between the terms "independent contractor" and "employee." The denial of recovery to numerous otherwise deserving claimants and the continued uncertainty of accurate definition obviously inspired another amendment to the statute which was accomplished by Act 179 of 1948, the effect of which was to extend coverage under the act, even to "independent contractors" who spent a substantial portion of their work time in manual labor in the execution of their contracts.
As the result of the amendment of 1948 the difficulties confronting the courts in connection with this particular point have been materially lessened. However, the benefit of this effect at simplification, while effective in cases involving application of the Workmen's Compensation Statute, unfortunately, has not been of assistance in those cases involving actions of third persons arising in tort.
The definition of "independent contractor", as now incorporated in the Workmen's Compensation StatuteLSA-R.S. 23:1021(6)which should be borne in mind, for whatever weight it may have, at least by analogy, in consideration of the tort claim asserted in the instant case, reads as follows:

*247 "`Independent Contractor' means any person who renders service, other than manual labor, for a specified recompense for a specified result either as a unit or as a whole, under the control of his principal as to results of his work only, and not as to the means by which such result is accomplished, and are expressly excluded from the provisions of this Chapter unless a substantial part of the work time of an independent contractor is spent in manual labor by him in carrying out the terms of the contract, in which case the independent contractor is expressly covered by the provisions of this Chapter."
Unquestionably, our jurisprudence with reference to definition of the term "independent contractor" and the consequent issue of liability has developed a dichotomous application as between cases involving claims for compensation and those involving liability in tort toward third persons. As a result, under the liberal interpretation policy in favor of claimants in compensation cases, the existence of possible doubts has been resolved against the status of independent contractor and in favor of that of employee, whereas, in tort claims, a contrary conclusion has sometimes resulted from consideration of somewhat similar factual circumstances. The very difficult and delicate problem has been admirably noted by Professor Malone in his work on Louisiana Workmen's Compensation Law and Practice, page 83, as follows:
"This difference in economic status between the contractor and the employee is the real point of reference that determines the outcome of these controversies in court. In no other group of cases have the court succeeded better in sensing their way to acceptable conclusions; but, unfortunately, in no other group of cases have the judges encountered more difficulty in framing legal distinctions to explain their judgments in lawyer-like language. This is because the problem is essentially one of policy rather than arbitrary rules. Legal terminology is simply not sufficient to meet the strain imposed upon it in these cases."
This problem of policy embodies the possibility of a somewhat dangerous and prejudicial resolution. If economic status is a controlling, or at least a persuasive, influence in resolving claims between employer and employee, it should be accorded an equal weight in resolving liabilities toward the public generally. In other words, we are convinced that an employer, who is deemed liable to a claimant upon the principle that the claimant is an employee and not an independent contractor, should not be permitted to escape liability to third persons simply upon the basis of a conclusion that the same employee, with respect to the claims of such third persons arising from tort, should be classified as an independent contractor.
Pertinent to the same rationale Professor Malone further comments, op. cit. page 91:
"We have previously observed that in these cases" (the hauling of lumber, etc.) "the complainant is nearly always without appreciable capital (apart from the truck or wagon which he usually owns) and that the rate of pay for this use is pretty well standardized. Likewise the hauler's job is integrated into the defendant's enterprise on a fairly stable basis and he is thus in a poor position to set a price that will cover the risk of personal injury."
Our point is that the same reasons which impel a definition of employee rather than independent contractor for the protection of employees as a class is entitled to serious consideration with relation to the protection of the public generally.
Numerous and varying rules of definition have been adopted by our courts, only to be subsequently modified, altered or even entirely rejected. Thus, we have had the application of the "actual control" test, later modified to "right of control"; the *248 "supervision" test, and the modification by distinction between "supervision as to results" and "supervision as to methods," etc., etc.
Before this court learned counsel, in able argument and enlightening briefs, have done much to reduce the issue to its ultimate terms. Counsel for defendants-exceptors place great reliance upon the opinion of Judge Porterie in Alexander v. Frost Lumber Industries, D.C., 88 F.Supp. 516, 522. Unquestionably, the opinion in the cited case evidences a learned and logical consideration and discussion of the jurisprudence of our state courts. Judge Porterie predicated his final conclusions upon the distinction between compensation and tort cases in the interpretation and application of the general rule of "control" and "right to control."
Counsel for plaintiffs, with equal vigor, urges the holding of the Supreme Court in the recent case of Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483, 486, in support of their contention.
In view of the fact that the Amyx case is the latest pronouncement of our highest court upon the issue with which we are directly concerned, we think it essential to devote somewhat detailed consideration to the opinion of Mr. Justice Simon and, accordingly, we quote the following pertinent extracts therefrom:
"The term `independent contractor', as was said in the case of Gallaher v. Ricketts, La.App., 187 So. 351, 355, `connotes a freedom of action and choice in respect of the undertaking and a legal responsibility on the part of the contractor in case the agreement is not fulfilled in accordance with its covenants.' A contractee-independent contractor relationship presupposes a contract between the parties. It likewise presupposes the independent nature of his business, and is not exclusive as to the means whereby it is accomplished. It should appear that the contract calls for a specific piecework as a unit to be done according to his own methods, without being subject to the control and direction, in the performance of the service, of his employer, except as to the result of the services to be rendered. It must also appear that a specified price for the overall undertaking is agreed upon; that its duration is for a specified time and not subject to termination or discontinuance at the will of either side without a corresponding liability for its breach,

"It is well settled by our jurisprudence that besides other factors, the most important test in determining `whether a person employed to do certain work is an independent contractor or a mere servant is the control over the work which is reserved by the employer.' It is also well settled that whether the employer `actually exercises control or supervision' over the movements and the services rendered by the employee, such a fact is of no great moment, the `important question is whether, from the nature of the relationship he had the right to do so.'

* * * * * *
"Clearly, as found from the undisputed evidence, there was no actual contractor's agreement for any specific undertaking as one unit or as a whole, or for any specific amount of work to be performed all told or of services to be rendered over a specified period of time. * * * There was no agreement as to how many cubic yards of gravel he would have to haul; he could haul one or five hundred, or none at all. There were from thirty to forty other truck drivers then operating their own trucks for defendant under the same conditions." (Emphasis by this court.)
It is to be particularly observed that, after thorough discussion of the principles of control and right of control, the opinion added an element of determination of the nature of the relationship between the parties which we paraphrase as being *249 the actual contractor's agreement for a specific undertaking as a unit or as a whole, or for a specified amount of work to be performed or services to be rendered over a specified period of time.
As we appreciate the above requirements the court said, in effect, that in order to fix the status between the parties as principal and contractor there must be an actual contract for a specific (a) undertaking, or (b) amount of work, or (c) services rendered, and, further, that such contract must embody a definite period of time within which the undertaking is to be performed.
We think it is clear that the court also measures the question of the existence, vel non, of a contractual agreement in the light of the assurance to both parties thereto of a right to enforce the terms or provisions of the agreement.
We regard the pronouncements of the opinion of the court in the Amyx case with enthusiastic approbation because, in our opinion, it goes far toward resolving the confusion of terminology heretofore evident in our jurisprudence, restoring dignity and meaning to the use of the terms "contract" and "contractor", and, it assures the public of the right to seek redress against responsible parties rather than to be relegated to judicial proceedings against impecunious and irresponsible employees sought to be interposed as shields against liability, under the guise of "independent contractors."
The agreement in the instant case, as evidenced by the facts hereinabove recapitulated, is one of those vague and uncertain oral "arrangements" or "understandings" which manifest none of the requisites of a contract and which effected only an employment. It follows that the exceptions should have been overruled.
The issue as to the coverage, vel non, of the Burns' truck under the policy of automobile liability insurance issued to the partnership is not before us on this appeal. This issue was raised by counsel for plaintiffs only in the alternative, to be considered in the event the exceptions should be maintained. Further, it is noted that the exceptions did not comprehend any question in connection with insurance coverage and, as hereinabove pointed out, were specifically directed to the proposition involving the relationship between Burns and the partnership. We assume this conclusion with respect to the question of insurance coverage accords with the position taken by counsel for defendants since the point was not alluded to in their brief before this court.
For the reasons assigned the judgment appealed from is set aside and reversed and
It Is Now Ordered, Adjudged and Decreed that the exceptions of no right and no cause of action filed on behalf of defendants be and they are overruled and the case is ordered remanded to the Honorable the Second Judicial District Court of the State of Louisiana, in and for the Parish of Claiborne, for further proceedings in accordance with law.
Costs of this appeal are taxed against defendants-appellees, and it is ordered that the fixing of all other costs await final determination hereof.
GLADNEY, Judge (dissenting).
With the utmost respect for the views expressed by a majority of the members of this court, I believe the importance of the question herein presented imposes upon the writer an obligation to express his views on the subject. In the historical case of Pollock v. Farmers' Loan & Trust Company, 157 U.S. 429, 15 S.Ct. 673, 700, 39 L.Ed. 759, 829, Justice White, then a comparatively recent member of the United States Supreme Court, justified the recordation of his dissent with an expression which reflects my feeling:
"The only purpose which an elaborate dissent can accomplish, if any, is to weaken the effect of the opinion of the majority, *250 and thus engender want of confidence in the conclusions of courts of last resort. This consideration would impel me to content myself with simply recording my dissent in the present case, were it not for the fact that I consider that the result of the opinion just announced is to overthrow a long and consistent line of decisions, and to deny to the legislative department of the government the possession of a power conceded to it by universal consensus for 100 years, and which has been recognized by repeated adjudications of this court." The decision on the issues presented on this appeal is not a final decree and, this being so, surely an elaborate presentation of my views is not appropriate at this time. I shall, therefore, only briefly record my differences on some of the salient points.
The record fails to reveal that members of the defendant partnership did, in fact, under their contract have the right to exercise control over performance of the contract by Burns and his employees, except as to results. Secondly, I am of the opinion that the services rendered by Burns were for a specified recompense for a specific result, either as a unit or a whole. In this respect Burns was engaged to cut all of the timber from a designated parcel of land, and it was his exclusive right to do so. The unit which formed the basis of the contract was as definite as was involved in Murphy v. Tremont Lumber Company, La. App.1945, 22 So.2d 79. Furthermore, there is nothing in the record, in my opinion, to indicate either party could withdraw from the contract to cut the designated tract of timber without incurring legal responsibility therefor. The situation here presented is somewhat as in Hall v. Southern Advance Bag & Paper Company, La.App.1935, 158 So. 829, where the extensiveness of the operations prohibited supervision of the movements and methods of performance. Certainly, in the instant case there was no attempt by any partner to give directions to any of the employees of Burns who personally selected and paid them. Nor do I think that the rendition of special bookkeeping services concerning tax liability of the individual contractor is material. The fact that the defendant partnership had in its employ persons with this know-how is purely accidental and in this instance constituted an accommodation between the parties entirely unrelated to a relationship of master and servant.
The majority view herein endorses the Amyx case with enthusiastic approbation because, inter alia, "it assures the general public of the right to seek redress against responsible parties rather than to be relegated to judicial proceedings against impecunious and irresponsible employees sought to be interposed as shields against liability, under the guise of `independent contractors.'" If this expression reflects any reason for the decision, it is inapt. Such a remedy as suggested must not be exercised by a court until the Legislature has seen fit to declare the liability of the principal for the torts of the employees of any impecunious or irresponsible contractor with whom he may deal.
For the foregoing reasons I respectfully dissent.