LOTTINGER, Judge.
This is an action ex delicto instituted by Mrs. Lemirl M. Landry, the widow of Marcel J. Landry, individually and as Natural Tutrix of her three minor children, they being issue of her marriage to the deceased, for damages for the alleged wrongful death of Marcel J. Landry. The defendants are Joseph O. Richard, Jr., the driver and co-owner of the truck which ran into the Landry automobile, Alex A. Richard, the other co-owner of the said truck, and American Surety Company of New York, the public liability insurer of said truck. Also joined as defendants were Nichols Construction Company, Inc. arid Joseph Y. Hargroder, d/b/a H and H Sand and Gravel Company, who petitioner claims were the employers of Joseph O. Richard, Jr., and Maryland Casualty Company, their liability insurer. YUBA Consolidated Industries, Inc. answered this suit on behalf of Nichols Construction Company, Inc., as its successor. The Lower Court awarded judgment in favor of Mrs. Landry, individually, and against the defendants in the sum of $89,-225.65, in favor of Mrs. Landry as Natural Tutrix of her minor child, Paul Marcel Landry, in the sum of $18,936.43, for the use and benefit of the minor child, Deanne Landry, in the sum of $16,748.97, and for the use and benefit of the minor child Johnnie A. Landry in the sum of $11,500.-00. The defendants, American Surety Company, Maryland Casualty Company and YU-BA Consolidated Industries, Inc. have all taken suspensive appeals. Joseph O. Richard, Jr. has perfected a devolutive appeal.
The undisputed facts show that Marcel J. Landry, the late husband of petitioner, Mrs. Lemirl M. Landry, was killed instantly as a result of a collision which occurred at approximately 2:40 o’clock P.M. on July 28, 1958 at the intersection of Plank Road and Mohican Street in the City of Baton Rouge. At the time of the accident the deceased was driving his automobile in an easterly direction on Mohican Street and the defendant, Joseph O. Richard, Jr., was driving the truck and trailer in a southerly direction on Plank Road. Traffic at the intersection was controlled by a semaphore signal device. At this intersection, Plank Road had 31.8 seconds of “green” and 3.6 seconds of “amber”. The “red” on Plank Road was of a duration of time equal to the combined time of the “green” and “amber” on Mohican Street, or 24.6 seconds; and the “red” on Mohican Street was of a duration of time equal to the combined time of the “green” and “amber” on Plank Road, or 35.4 seconds. The cycle of the light was from “green” to “amber” to “red” and then from “red” back to “green”. The light for both streets alternatively was on “amber” for 3.6 seconds between “green” and “red”. There was no “amber” between “red” and “green” for either street.
The intersection where this accident occurred is one of large proportions. Plank Road has a width of fifty feet at that point and Mohican has a width there of sixty-two feet. Plank Road has four lanes of traffic, two northbound and two southbound, with a raised separation or media in the center of the street. At this intersection Mohican Street has two raised traffic separations with five lanes for traffic, the situation being the same for eastbound as well as westbound traffic. The extra media or separator provides a lane for people who wish to make left turns. There is no dispute as to the location of the point of collision. It was in the southwest quadrant of the intersection, at a point six feet north of the southern line of Mohican Street and ten feet east of the western line of Plank Road. The weather was clear and the streets were dry. The truck driven by the defendant, Joseph O. Richard, Jr., which was headed south on Plank Road left skid marks before the collision from each set of wheels. It *740 has three sets of wheels, that is, two sets of wheels on the tractor and one set of tandem wheels on the trailer. These wheels left skid marks of sixteen feet before the point of collision and twenty feet after the point of collision. The skid marks curved to the truck driver’s left, and the brakes on the truck were in good working order at the time of the accident.
The record contains two volumes of testimony, scale drawings of the intersection, and some thirty-three photographs of the vicinity of the intersection and the vehicles after the accident. As might be expected, the testimony as to the accident is conflicting. The primary question in determining what was the proximate cause of this accident depends on the decision as to which of the two drivers ran the “red” light which controlled the traffic at the intersection.
The Lower Court gave written reasons for judgment numbering thirty pages. Dewey Watkins, a witness for petitioner, testified that just prior to the accident he was driving a truck in a southerly direction on Plank Road. He was on the inside lane and for at least one block before reaching the intersection where the accident occurred he was driving parallel with, and side by side to, the truck driven by the defendant, Joseph 0. Richard, Jr., which was in the outside lane also traveling south. Watkins testified that both trucks were traveling about twenty to twenty-five miles per hour. When the two trucks passed Weller Avenue, a short block north of the intersection where the accident occurred, they did not have to stop for a red light, and they crossed Weller Avenue at the same time. Watkins testified that as the two trucks were a little over half way between Weller Avenue and Mohican Street, the traffic signal at the intersection of Plank Road and Mohican Street turned “red”. He testified that it had turned "yellow” as they went under the light on Weller Avenue. Mr. Watkins testified that he stopped for the red light at the intersection of Plank Road and Mohican Street but that the defendant Richard did not stop but, on the contrary, entered the intersection against the red light. As the Richard truck got under the signal light, the Landry vehicle entered the intersection and the impact occurred.
Another witness for petitioner was Aaron Robins who was a pedestrian attempting to cross Mohican Street at the time of the accident. He testified that the light turned “green” for Mohican Street traffic when the Landry automobile was “about two or three car lengths or a little better from the light”, and that the light was “green” when Landry entered the intersection. These are the only two witnesses who testified as to the color of the light at the time of impact. However, there were other witnesses whose testimony tended to corroborate the testimony of Watkins and Robins, and we feel that the decision of the Lower Court in holding that the light was “green” for Mohican Street traffic at the time of the impact was correct. Accordingly, the evidence discloses that Mr. Richard was crossing the intersection on a “red” or stop signal.
The facts disclose that a car which was driven by Mr. Watlington was stopped on Mohican Street facing in an easterly direction on the inside lane of traffic to pick up Mr. Morris. Both of these gentlemen testified on behalf of petitioner, and they tended to corroborate the statements made by Watkins and Robins. The defendants argued that Mr. Landry, the deceased, was negligent in passing the stopped Watlington vehicle on its right side in attempting to proceed across Plank Road. The Lower Court held that Mr. Landry was not negligent in this respect inasmuch as he was traveling with a “green” light, and, as any prudent driver, could expect that those traveling on Plank Road would stop for the “red” light. Accordingly, we feel that the sole cause of the accident was the negligence of the defendant, Joseph O. Richard, Jr., in crossing the intersection in the face of the “red” traffic signal.
The next question to be decided is the relationship between the parties defendant *741 so as to determine their various liabilities. The record discloses that on February 28, 1958, Esso Standard Oil Company executed a contract with Nichols Construction Company, Inc. for certain construction work to be performed on the premises of the Esso plant in Baton Rouge. Included as a part of the contract was the furnishing of clay fill material to be hauled in from outside the plant at $1.25 per cubic yard. This item was a minor part of the total contract. The contract provided that no part thereof shall be sublet (except for the delivery of material) without the prior written consent of Esso, and further provided that if any of the work is sublet, contractor shall carry Contractor’s Protective Liability Insurance in the amount of not less than $100,000.00 to cover injury or death of one person and not less than $300,000.00 to cover all persons injured or killed as a result of one accident. The contract further provided for Automobile Liability Insurance, (if motor vehicles are used in the performance of the work) in the minimum amounts of $100,000.00-$300,000.00.
Mr. Joseph Y. Hargroder, who had been in the sand and gravel business for several years under the trade name of H. and H. Sand and Gravel, heard that Nichols required sand fill and went to talk to the Nichols’ official. As a result, he got the job of supplying what clay fill was required, at the delivered price of $1.05 per yard. He inquired about a bulldozer which would be needed in the job, and Nichols offered to rent him one for $1250.00 per month. At this time, Mr. Hargroder owned five or six dump trucks which were mortgaged. No other equipment necessary for the job was owned by him. After he secured the job, Mr. Hargroder went “looking for dirt,” and was successful. He next went to a Baton Rouge concern to purchase a used dragline for some $17,000.00, and his credit was approved. However, upon commencement of the job a bulldozer and dragline owned by Nichols was sent to the job site. Hargroder did not return this equipment to Nichols, nor did he purchase the used drag-line which he had sought. A “purchase order” was issued to H. and H. Sand and Gravel on April 2, 1958 to “furnish fill dirt as required for our project at Standard Oil Co. Dirt to be furnished, loaded and hauled by you.” The work commenced. Among the equipment furnished by Nichols were bulldozers, and loaders, tractors, cranes and dump trucks. The operators of this equipment were furnished and paid by Nichols. Hargroder had no control over these operators, nor could he fire them. A representative of Nichols instructed Har-groder when to haul and when not to haul. He would tell him at what time of day.to commence hauling and at what day to shut down. During the entire operation, from April, 1958, until the date of the accident, July 28, 1958, Hargroder worked exclusively for Nichols. During this period, not one single load of dirt was hauled for anyone else, or for any other job.
The bookkeeping for the job was done almost exclusively by Nichols, Hargroder would bill Nichols for the fill hauled. Nichols would bill Hargroder for equipment rental, operators’ salaries, and fuel used in Nichols equipment. Sometimes these latter items would be deducted by Nichols. Sometimes Nichols would pay for dirt hauled, and Hargroder would reimburse Nichols for equipment rental, etc.
Mr. Turner, the general manager of Nichols, testified that the Nichols’ equipment was operated by its own employees under Mr. Hargroder’s supervision. Mr. Hargroder signed the time tickets on Nichols employees. Mr. Alleman, the comptroller of Nichols, testified that Mr. Hargroder could not fire Nichols employees on the job. He did not know whether Mr. Hargroder could refuse to use them. Mr. O’Neal, a representative of Nichols, told Hargroder when to start and stop delivery each day.
The Richard brothers, Joseph and Alex, were partners in ownership of the dump truck which was involved in the fatal ac *742 cident and were brothers-in-law to Mr. Hargroder. Hargroder arranged to pay them at the rate of ten dollars per load.
The evidence and testimony discloses that the work was under the strict control of Nichols. As a matter of fact, the greater part of the equipment and its operators were furnished by Nichols. Mr. Hargroder furnished only a small part of the equipment and labor to do this job which ran to some $70,000.00. The only phase of the job which might tend to show a vendor-vendee relationship or a contractor-subcontractor relationship between the parties was that of bookkeeping. The mere fact that the bookkeeping entries tended to show that Nichols rented its equipment and employees to Hargroder is not sufficient to change the relationship from that of employer-employee. The job was performed mostly by Nichols’ employees with Nichols equipment. The job could have been done by Nichols without Hargroder. However, it could not have been done by Hargroder without Nichols, as Hargroder had neither the equipment nor financial status to perform. The “purchase order” was merely a formality. Hargroder could have been discharged by Nichols at any time. In Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483, the Supreme Court said:
“It is well settled by our jurisprudence that besides other factors, the most important test in determining ‘whether a person employed to do certain work is an independent contractor or a mere servant is the control over the work which is reserved by the employer.’ It is also well settled that whether the employer ‘actually exercises control or supervision’ over the movements and the services rendered by the employee, such a fact is of no great moment, the ‘important question is whether, from the nature of the relationship, he had the right to do so.' ”
In Malloy v. Buckner-Harmon Wood Contractors, La.App., 100 So.2d 242, the Court, after quoting at length from the Amyx case with approval, added:
“As we appreciate the above requirements the court said, in effect, that in order to fix the status between the parties as principal and contractor there must be an actual contract for a specific (a) undertaking, or (b) amount of work, or (c) services rendered, and, further, that such contract must embody a definite period of time within which the undertaking is to be performed.”
The only thing furnished by Hargroder was services. These services consisted of four or five dump trucks and dirt. For furnishing the dirt he was paid $1.05 per cubic yard. From this sum he was required to pay the landowner 6.6‡ per yard, plus the rental on equipment and operators. The Richards were paid $10.00 per load, or 83^ per yard. When you add to this 8 per yard, the cost of 6.6‡ per yard, plus the rental on the loading equipment and operators furnished by Nichols, it readily appears that Hargroder received very little for his services. Furthermore, had Har-groder been an independent contractor, he would have been required to furnish liability insurance under the provisions of the Esso contract.
We therefore agree with the holding of the Lower Court in holding that Joseph O. Richard, Jr., Alex A. Richard and Joseph Y. Hargroder were all employees of Nichols, and that, at the time of the fatal accident, Joseph O. Richard was acting in the course and within the scope of his employment with Nichols Construction Company. In so holding the Lower Court observed :
“To reach any other conclusion the Court would have to conclude that had this accident happened in one of the dump trucks owned by Nichols Construction Company and being driven by an employee admittedly on their *743 payroll there would be no responsibility on the part of Nichols, because to accept the position of Nichols Construction Company this employee paid by that company and driving that company’s truck would be an employee of Mr. Hargroder. Such a conclusion is not only legally unsound but defies reality.”
In reaching its award as to quantum, the Lower Court computed the award for loss of support by taking into account the monthly wage of the deceased, his age at the time of death, and the American Experience Mortality Table as set forth in R.S. 47:2405. The Court then said:
“Using the formula in the Duree and Stephens cases ([Duree v. State, La.App.] 96 So.2d 854 and [Stephens v. Natchitoches Parish, School Board, La.App.] 100 [110] So.2d 156 respectively) cited supra this court finds that Mrs. Landry is entitled to receive the sum of $107,359.00, less discount.” (Parenthesis ours)
The Lower Court then awarded the discounted sum of $74,181.65 as the sum Mrs. Landry was entitled to recover for loss of support. This discounted value was computed to begin at the date of judgment. However, in McFarland v. Illinois Central Railroad Company, 241 La. 15, 127 So.2d 183, the Court held that the loss of support is not subject to mathematical computation. The same would, of course, apply to the awards for loss of support to the children.
The Lower Court awarded Mrs. Landry the sum of $74,181.65 for loss of support. It awarded her for and on behalf of Johnnie Landry, who lacked one and one-half years of reaching the age of majority at the time of his father’s death, the sum of $1500.00, and awarded Deanne Landry, who was thirteen years of age, $6748.95,- and Paul Landry, who was ten years of age, the sum of $8926.43
At the time of death, Mr. Landry was 46 years of age and earning the sum of $751.50 monthly. We believe that the awards for loss of support were excessive and they shall be reduced as follows: Mrs. Landry, $45,000.00, Johnnie Landry, $1,-000.00, Deanne Landry, $5,000.00, and Paul Landry, $7,000.00.
For loss of love, affection, companionship and guidance, the Lower Court awarded Mrs. Landry the sum of $14,000.00 and each of the children $10,000.00. These awards will be reduced to the sum of $12,-000.00 for Mrs. Landry, $2500.00 for Johnnie Landry, $5,000.00 for Deanne Landry and $6,000.00 for Paul Landry. The special award of $1044.00 for funeral expenses will remain.
For the reasons hereinabove assigned, there will be judgment herein amending the judgment of the Lower Court so as to give judgment in favor of Mrs. Lemirl Landry, individually, and against the defendants, Joseph O. Richard, Jr., American Surety Company of New -York, YUBA Consolidated Industries, Inc., successor to Nichols Construction Company, Inc. and Maryland Casttalty Company, in solido, in the full sum of $58,044.00, and in favor of Mrs. Lemirl M. Landry as natural tutrix of and for the use and benefit of the minor child, Paul Marcel Landry, and against the same defendants, in solido, in the sum of $13,000.00, and in favor of Mrs. Lemirl M. Landry, as natural tutrix of and for the use and benefit of the minor child, Deanne Landry, against the same defendants, in solido, in the full and true sum of $10,000.00, and in favor of Johnnie A. Landry, who has now reached the age of majority, and against the same defendants, in solido, in the sum of $3500.00, all plus interest at 5% per annum from date of judicial demand until paid, the award as against American Surety Company of New York being limited to its policy limits of $20,000.00, all costs shall be paid by the defendants. The said judgment of the *744 Lower Court as hereinabove amended, will be affirmed.
Judgment amended and affirmed.
Rehearing denied. HERGET, J., dissents.