202 So.2d 704 (1967)
Mrs. Sandra Lynn ALLIEN, Individually, and as Tutrix of her minor daughter, Robbin Denine Allien, Plaintiff and Appellee,
v.
LOUISIANA POWER & LIGHT COMPANY, Defendant and Appellant.
No. 2084.
Court of Appeal of Louisiana, Third Circuit.
September 6, 1967.
Rehearing Denied October 11, 1967.
*705 Theus, Grisham, Davis, Leigh & Brown, by Thomas W. Leigh, Monroe, for defendant-appellant.
McKeithen & Mouser, by Vinson M. Mouser, Columbia, for plaintiff-appellee.
Stafford & Pitts, by Grove Stafford, Jr., Alexandria, for defendants-appellees.
Voorhies, Labbe, Fontenot, Leonard & McGlasson, by J. Winston Fontenot, Lafayette, for intervenor-appellee.
Before TATE, SAVOY and CULPEPPER, JJ.
CULPEPPER, Judge.
This is a suit for damages for the wrongful death of Odis Doyle Allien, Jr. He was electrocuted when a portable drilling rig, being used to rework an oil well, was raised into contact with a 13,800 volt electric line of the defendant, Louisiana Power & Light Company. Plaintiff is the decedent's widow, Mrs. Sandra Lynn Allien, who sues individually and as tutrix of the minor child, Robbin Denine Allien. In the lower court, a jury awarded $85,000 to the widow individually and $45,000 for the use of the minor. The defendant, Louisiana Power & Light Company, appealed.
The substantial issues on appeal are: (1) Was the defendant power company negligent in constructing and maintaining the uninsulated high voltage line in close proximity to the well? (2) Was the decedent *706 contributorily negligent? (3) Is the quantum of damages awarded excessive?
There is little dispute as to the facts. In order to understand the evidence, it is necessary to describe the area in which the accident occurred and the events leading thereto. George Belchic, Inc., hereinafter referred to simply as "Belchic", owned the "Mills lease" in a rural area in the pine hills of LaSalle Parish. On this lease Belchic operated six producing oil wells, with 40 acre spacing. In one 40-acre unit the first well, known as Mills #3, stopped producing because of some defect. Thereafter another well, known as Mills #3-X, was drilled nearby on the same unit and became a producer. The accident occurred in a clearing of approximately one acre in which these last two mentioned wells are located.
This clearing is about 160 feet west of a public highway and is approximately 200 feet square. The southern half of the clearing is filled largely with salt water pits surrounded by levees. The northern half of the clearing is, for the most part, a leveled area, partly graveled, used for vehicles and other oil field equipment. A small graveled road leads from the public highway in a westerly direction, approximately through the middle of the clearing, between the salt water disposal pits and the leveled area. Mills #3, the abandoned well, is observable as pipe and valves protruding three or four feet above ground level, located near the northwest corner of the salt water pits. The producing well, Mills #3-X, observable as a well with a pump and motor attached, is located near the northwest corner of the clearing, at a distance of about 100 feet north of Mills #3.
In the early part of 1964, Belchic decided to dispose of salt water from the six wells by installing a new pump and pumping the water back into the ground through the abandoned well, Mills #3. Belchic contracted with Louisiana Power & Light Company to furnish electric power to operate the new pump. This contract did not specify the exact location of the proposed pump, because it had not yet been chosen, but a letter from Mr. Robert E. McDowell, an executive of Belchic, informed Louisiana Power & Light Company that the exact location of the requested service would be pointed out to them by Mr. Bobby Graham, Belchic's representative who lived near the Mills lease.
On or about August 3, 1964, the power company's survey crew went to the lease to stake the location of the new line. They contacted Bobby Graham but he did not know, for it had not yet been decided, exactly where the disposal pump was to be located. This survey crew testified they did not even see Mills #3, the abandoned well, but they did see Mills #3-X, the producing well, and assumed that this was the well to be used for salt water disposal. Accordingly, the survey crew staked the location of the proposed power line to run from an existing line on the public highway, generally along the little graveled road through the clearing, a distance of about 411 feet to a point which they assumed would be near the pump to be serviced. Due to the length of the new line, it was necessary that two poles be set. One was staked at a distance of 226 feet from the highway line and the terminal pole was staked 185 feet west of the intermediate pole.
Although the survey crew testified they did not even see it, Mills #3, the abandoned well which was to be used for salt water disposal, was clearly visible as a pipe and valves protruded three or four feet above the earth's surface. As surveyed, a point immediately beneath the proposed power line was only 26 feet north of this well. The location of the terminal pole was staked 47 feet west of this point.
In October of 1964, which was about two months after the survey, the line was actually constructed by a crew of W. S. Young Construction Company, Inc., pursuant to an agreement with the defendant power company. On October 21st and 22nd, 1964, this crew proceeded to set the two new poles, install the necessary cross arms and hardware *707 and string an uninsulated 13,800 volt line to the terminal pole above described. They then hung three transformers on the terminal pole to reduce the voltage from 13,800 to 480, which was the voltage requested to service the salt water disposal pump. At this point, Mr. Bobby Graham, Belchic's local representative, came to the scene and advised the construction crew that the salt water disposal pump was to be located on a concrete slab just across the little gravel road from the intermediate pole; and that since service would be needed at that point, the transformers should be moved to the intermediate pole. This being contrary to the survey and plans which the construction crew had received from the power company, the foreman of the crew phoned Mr. Joe Colvin, Louisiana Power & Light Company's local service man, and obtained permission to relocate the transformers on the intermediate pole. The transformers were then moved, but the 13,800 volt uninsulated wire, extending from the intermediate pole to the terminal pole a distance of 185 feet, was left in place and later energized although it served no useful purpose whatsoever.
It should be noted at this point that there is a factual dispute as to whether the power company erroneously ran the line to the wrong point or installed the transformers on the wrong pole. The survey crew contends that Bobby Graham, Belchic's representative, pointed out to them, at the time of the survey, the location of the terminal pole; from which the survey crew assumed that it was the producing well, Mills #3-X, which was to be serviced. Mr. Graham denies that, explaining that he did not know at the time where the salt water disposal pump was to be located. In the final analysis, this factual dispute is immaterial. For, regardless of whether the survey was in error, or the transformers initially installed "on the wrong pole", the final decision to move the transformers and leave the unneeded 13,800 volt line in place to the terminal pole, was made by the power company's representatives, for whose negligence in this respect, if any, it is responsible.
After the line was constructed and service furnished to the new pump near the intermediate pole, Belchic contracted with Allien Well Service Company to rework Mills #3 and make it suitable for salt water disposal. On the date of the accident, March 29, 1965, Allien sent a crew of four men, including the decedent, who was the son of the owner of the company, to rework the well.
The rig used for this purpose is mounted on a truck. A mast is attached to the rear of the truck with hinges. In the collapsed position, the other end is carried in a "headache rack" over the front of the truck. To rework a well, the truck is backed to within about six feet of the well, where the mast is then raised to its full heighth of approximately 35 feet from ground level. Then another extension, telescoped inside the mast, is raised to a total heighth of about 65 feet. In the raised position the rig is stabilized by guywires and can be used to remove pipe and tubing from the well and to lift equipment.
In anticipation of the arrival of Allien's crew, Belchic's representative had obtained the pipe to be used and had stacked it on a rack, located a few feet east of the well, between the little gravel road and the salt water disposal pits. When the crew reached the scene, this pipe rack prevented them from using this location to park the truck. The crew testified they could not use the area south of the well because of the salt water disposal pits; and could not use the area west of the well because of a steep downgrade there which would have required jacking the front end of the truck up several feet, even if such a position was possible in view of the muddy ground.
The three surviving members of the crew testified they did not see the uninsulated 13,800 volt line which passed at a heighth of 28 feet and at a distance of 26 feet north of the well. Hence, they positioned the truck north of the well and directly under *708 the line. Then they prepared to raise the mast.
The decedent, Odis Doyle Allien, Jr., had driven to the scene in a pickup truck. He was changing his clothes and took no part in the positioning of the rig or the raising of the mast. As the mast was being raised, young Allien walked to a position from six to ten feet from the rear of the truck where he was standing when the mast came in contact with the 13,800 volt line. He received a severe charge of electricity, either through direct contact with one of the guy-wires, or through the wet ground on which he was standing. He fell to the ground and died shortly thereafter.
Let us now discuss the applicable law. There is little dispute as to the general duty of care required of a power company in the construction and maintenance of its lines. The question is whether, under this particular set of facts, the power company has satisfied its duty. Both plaintiff and defendant have cited Calton v. Louisiana Power & Light Company, 56 So.2d 862 (La. App. 2d Cir. 1952, amended and affirmed 222 La. 1063, 64 So.2d 432) in which the court quoted a concise statement of the law from 18 Am.Jur. 443-446 as follows:
"According to numerous decisions, where the wires maintained by a company are designed to carry a strong and powerful current of electricity, so that persons coming in contact with them are certain to be seriously injured, if not killed, the law imposes upon the company the duty of exercising the utmost care and prudence consistent with the practical operation of its plant to prevent such injury: * * * The law is complied with when the company provides such a protection as will safely guard against any contingency that is reasonably to be anticipated. The company is not legally bound to safeguard against occurrences that cannot be reasonably expected or contemplated." (citations omitted)
Plaintiff cites several Mississippi cases in which the courts have applied to the above quoted general rule to facts substantially similar to those presented here and found the power company negligent. In Southern Pine Electric Power Association v. Denson, 214 Miss. 397, 57 So.2d 859 (1952) an uninsulated line was erected almost directly over decedent's water well near his home. While repairing the well, decedent pulled the pipe out of the ground and it came in contact with the electric line. In holding the power company negligent, the court found it was "reasonably foreseeable" that the water well would at some time be in need of repair and that the pipes would have to be removed and those performing the operation would be exposed to great danger. See also 4-County Electric Power Association v. Clardy, 221 Miss. 403, 73 So.2d 144, 44 A.L.R.2d 1191; Mississippi Power & Light Company v. Walters, 248 Miss. 206, 158 So.2d 2, 160 So.2d 908 (1963); Alabama Power Company v. Smith, 273 Ala. 509, 142 So.2d 228.
The defendant relies on cases in which the courts, also applying the above quoted general rule, have found the power company free of negligence. For instance, in Calton v. Louisiana Power & Light Company, supra, the power line was constructed across a gravel road which led to a sawmill. The line was eight feet higher than the minimum elevation required by the National Bureau of Standards. A large piece of equipment, known as a "log loader", was being moved along the road when its boom struck the line. The court found the defendant power company had complied with the rules of the National Bureau of Standards of the United States Department of Commerce and that it was not reasonably foreseeable that such a high piece of equipment would be moved along this road.
Defendant also cites Webb v. Louisiana Power & Light Company, 199 So. 451 (La. App.2d Cir. 1940) in which the power line was constructed 24 feet above a water well at a residence. This was nine feet in excess of the minimum of 15 feet required by the Bureau of Standards. During the repair of the well, a 30 foot length of pipe *709 was pulled from the ground and came in contact with the power line. The court held: "Defendant could not have reasonably anticipated that decedent would withdraw from the ground connected well pipe of a length, here more than 30 feet, that would make contact with the transmission line."
In Boone v. New Orleans Public Service, Inc., 109 So.2d 800 (Orl.La.App.1959) a power line was constructed 32 feet above the surface of a city street. The minimum required by the Bureau of Standards was 20 feet. During the course of street repair, a truck crane came in contact with the line. The court held the power company had complied with the Bureau of Standards and that this was not a reasonably foreseeable hazard.[1]
With reference to safety codes, mentioned in some of the above cited decisions, the National Electrical Safety Code of the U. S. Department of Commerce, National Bureau of Standards, requires 20 feet of clearance for a line of this voltage over a road. (Rule 232-A). This rule has no application here because the line was not over a road at the point where it was struck. Applicable here is the general rule set forth in the National Electrical Safety Code in the following sections:
"210. Design and Construction.
All electric supply and communication lines and equipment shall be of suitable design and construction for the service and conditions under which they are to be operated.
"211. Installation and Maintenance.
All electric supply and communication lines and equipment shall be installed and maintained so as to reduce hazards to life as far as practicable."
Both plaintiff and defendant introduced the testimony of expert witnesses giving opinions as to whether this line was constructed too close to the well, i. e., whether the defendant power company had reduced reasonably anticipated hazards as far as practicable. As a preface to a discussion to this expert testimony, we should state the evidence shows clearly that the defendant power company had been furnishing service to oil well equipment in this area since about 1940 and its representatives knew that oil wells had to be periodically reworked with portable rigs similar to that used here.
Defendant's experts, who were its own engineers and those of three other power companies, testified simply that the line, as constructed 26 feet from the well, was not an "undue hazard" to reworking the well. They said the line was clearly visible and the crew could have raised the rig from other locations; that the pipe rack could have been moved and the truck positioned there; or the truck could have been placed on the west side of the well and the front end jacked up. One of these experts took and identified pictures of three other wells in the area over which power lines passed. But we note that all three of these wells are under lines along public roads. Of course, these experts recognized that any power line creates a hazard to a degree. But they argued that this line was clearly visible and it was not reasonable to anticipate that a crew reworking the well would fail to see the line and raise a rig into contact therewith.
Defendant's experts also testified that it is a policy of power companies to leave energized any line left standing; and that it was in keeping with standard procedures to leave this terminal span up. Defendant's own engineers said there was a possibility of using this span in the future to extend service on to other wells in the area. But they admitted that the line had no present utility and could have been removed for about $48.
*710 The plaintiff called as an expert witness Professor Ambrose K. Ramsey, of the School of Electrical Engineering at Louisiana State University. It was Dr. Ramsey's opinion that this uninsulated high voltage line, within 26 feet of the well, constituted an "undue hazard" to the reworking of the well which was periodically necessary. He stated this hazard could have been remedied by relocating the line on another route; or raising the line to a higher elevation; or insulating it. He also pointed out that this terminal span served no useful purpose whatever and could have been removed at a nominal cost. The idea here is that since the line served no purpose the hazard which it created is particularly unwarranted. Hence, it was his opinion that the power company had not complied with the requirement of National Electrical Safety Code Rule 211 that the line be installed "so as to reduce hazards to life as far as practicable."
Dr. Ramsey stated further that he felt it was the duty of the power company to know generally the area in which a line is installed and the normal activities of the business to be served in order that the lines can be installed in such a manner as to reduce hazards which probably will arise under such circumstances. Under this theory, it was Dr. Ramsey's opinion that the defendant power company should have known this well would probably be reworked from time to time and that on such occasions an uninsulated high voltage line within 26 feet of the well would constitute an undue hazard.
Plaintiff's witnesses, Odis D. Allien, owner of the well service company, David Yule, foreman of this particular well servicing crew, and Kermit Thomas, a member of the crew, all of whom have had considerable experience servicing wells in the area, testified that they had never seen a high voltage line this close to an oil well and that in their opinion such a line constituted a great hazard to reworking operations.
After careful consideration, we think it is unnecessary for us to decide whether a power company is negligent in every case where it installs and maintains an uninsulated high voltage line within 26 feet, and at an elevation of 28 feet, from an oil well which the power company knew or should have known would have to be reworked periodically with portable rigs. In the present case, there is a unique factor which, added to all of the other circumstances, forces us to the conclusion that the power company was negligent. This fact is that the power line in question had no utility whatever and could have been removed at a nominal cost.
We note particularly that Rule 211 of the National Electrical Safety Code, quoted above, requires power companies to install and maintain their lines in such a manner "as to reduce hazards to life as far as practicable." This rule recognizes that every electric line creates some hazard but our society must take a certain amount of risk in the use of this wonderful source of power. However, the hazard must be reduced "as far as practicable.", which means that the degree of hazard must be balanced against the utility of the electrical equipment. In the present case, the hazard was substantial but the offending line had no utility whatsoever. Clearly, the defendant power company did not reduce the hazard "as far as practicable." within the meaning of Rule 211.
This rationale of National Electrical Safety Code Rule 211 is also fundamental to the general law of negligence. In the recent case of Goff v. Carlino, 181 So.2d 426 (La.App. 3rd Cir. 1965, writ refused) this court said:
"Negligence is conduct which creates an unreasonable risk of foreseeable harm to others. Brown v. Liberty Mutual Ins. Co., 234 La. 860, 101 So.2d 696; Fontana v. State Farm Mutual Auto. Ins. Co., La.App. 3 Cir., 173 So.2d 284; Larned v. Wallace, La.App. 3 Cir., 146 So.2d 434; Restatement of Torts Second (1965), *711 Section 284. The risk of foreseeable harm to others is unreasonable so as to be negligence, if the magnitude of the risk created outweighs the utility or social value of the conduct creating it; in this respect consideration is given, inter alia, to the probability or extent of the harm to others threatened by the risk. Restatement of Torts Second (1965), Sections 291-293. `As the extent of the chance of harm increases, the utility required to justify the risk increases proportionately.' Comment b., Restatement Section 293."
Prosser on Torts, 3rd Ed.1964, Section 31 at page 151 discusses this element of negligence as follows:
"Against this probability, and gravity, of the risk, must be balanced in every case the utility of the type of conduct in question. The problem is whether `the game is worth the candle.' Many risks may reasonably be run with the full approval of the community. Chief among the factors which must be considered is the social value of the interest which the actor is seeking to advance. * * * The public interest will justify the use of dangerous machinery, so long as the benefits outweigh the risk, and a railroad may reasonably be constructed near a highway, even at the expense of some danger to those who use it."
In our own appellate courts, the rule has often been used in cases dealing with nuisances attractive to children. Saxton v. Plum Orchards, Inc., 215 La. 378, 40 So.2d 791 (1949); Holland v. Vidrine, 133 So.2d 809 (La.App., 3rd Cir. 1961); Slaughter v. Gravity Drainage District #4, 145 So.2d 50 (La.App., 3rd Cir. 1962); Martin v. City of New Orleans, 98 So.2d 559 (Orl.La.App. 1957); Frensley v. Gravity, 180 So.2d 743 (La.App., 3rd Cir. 1965); Stanley v. Missouri Pacific R.R. Company, 179 So.2d 490 (La.App., 3rd Cir. 1965).
It is our conclusion that the defendant power company was negligent and that its negligence was clearly a proximate cause of the accident. The next issue is whether the decedent was guilty of any contributory negligence barring plaintiff's recovery. As stated above, Doyle Allien played no part in the positioning of the rig or the raising of the mast. He had arrived at the scene in his own vehicle and was changing clothes while these preliminary operations were being performed by the three other members of the crew. He had walked up to within six to ten feet of the rear of the truck, when the mast struck the power line.
Defendant argues that Allien should have seen the line and thereby known of its presence; that he was therefore negligent for leaving a place of safety and going to the truck when he knew or should have known that the mast was being raised into contact with the high voltage line. The power company cites Southern Maryland Electric Co-operative v. Blanchard, 239 Md. 481, 212 A.2d 301 (1965) where plaintiff was erecting a TV antenna which came in contact with an electric line. The court pointed out that any person must use his senses to avoid injury to himself and held that plaintiff was contributorily negligent for failing to see the line.
Defendant also cites Goetz v. Green River Rural Electric Co-op., 398 S.W.2d 712 (Ky.1966) in which plaintiff brought a 34-foot long television antenna into contact with an electric line. There also, plaintiff was found contributorily negligent.
We have no quarrel with the cases defendant cites, but they have no application here. There, it was the plaintiff who raised an object into contact with a power line which was obvious and which he saw or should have seen. Here, the decedent played no active part in causing the mast to strike the wire. Although the issue is not before us, the three members of the crew who were actively engaged in positioning the truck and raising the mast, may have been negligent for failing to see this electric line. However, it is perhaps unnecessary to state so obvious a proposition of law *712 that any negligence on their part is not imputed to the plaintiff.
Applicable here is the rule that a person with no actual or implied knowledge of the danger has a right to rely on those who have a duty to protect his safety. This rule is stated in Normand v. Piazza, 145 So.2d 110 (La.App. 4th Cir. 1962) as follows:
"Moreover, in the absence of knowledge of the danger or a threat of danger, a person may rely upon the care of others who are duty bound to avoid injury to him, and, thus, he may assume that he is not exposed to nor threatened by danger which can come to him only from a breach of duty which others owe to avoid injury to himhowever such duty arises, whether by statute, or from contract, or from the relationship of the parties. 65 C.J.S. Negligence, § 118, p. 711 et seq."
In the somewhat similar case of Vogt v. Hotard, 144 So.2d 714 (La.App. 4th Cir. 1962) plaintiff was helping defendant to fell a tree. Defendant had cut the tree, tied ropes to the top and to an automobile and made all arrangements to pull the tree down. Plaintiff, who was merely standing nearby and had played no active part in any of these arrangements, was struck by the tree when it fell. The court held, in effect, that plaintiff had a right to rely on defendant using due care to protect his safety and, in the absence of any knowledge of the danger, plaintiff was free of contributory negligence. See also Baham v. Eagle Indemnity Company, D.C., 78 F. Supp. 665, where an employee, on a construction job, walking on a platform erected across an open space by carpenters had a right to rely on their doing a reasonably safe job; Ford v. Tremont Lumber Company, 123 La. 742, 49 So. 492; Weadock v. Eagle Indemnity Company, La.App., 15 So. 2d 132.
Applying the rationale of these cases to the present matter, it is obvious that Allien had no actual knowledge of the power line immediately above the truck and hence was unaware of the very dangerous situation which was developing. Since he had no responsibility for, and played no part in, the positioning of the truck or the raising of the mast, he had no duty to make a minute inspection for hazards and hence no knowledge of the danger is implied. He had a right to rely on the duty of the three crew members performing this operation to use due care for the safety of all concerned. In so relying on their care, we think Allien acted as any reasonably prudent may would have under the circumstances.
The final issue is whether the quantum of damages awarded by the jury is excessive. As stated above, the jury awarded $85,000 to the widow individually and $45,000 for the benefit of the minor daughter. The facts show that at the time of his demise Allien was 21 years of age with a life expectancy of about 48 years. The widow was 17 years of age and the minor daughter about two.
The decedent had attended college for two years and, at the time of the accident, was working on this well servicing crew earning wages of about $4,800 per year. The evidence shows that he was an industrious young man with a good future; that he and his wife and child were making the beginnings of a happy life together; and that the loss of love and companionship, as well as future income and support, is substantial.
Plaintiff cites Tison v. Fidelity & Casualty Company of New York, 181 So.2d 835 (La.App. 2d Cir. 1966) in which a 41 year old decedent earned about $10,000 a year. A lower court award of $71,664 was raised to $101,664 and an award of $25,000 for the minor daughter was affirmed.
Defendant cites Landry v. American Surety Company of New York, 149 So.2d 738 (La.App. 1st Cir. 1963) where the decedent was 46 years of age and earned about $9,000 annually. The court awarded *713 his widow a total of $57,000 and the children various amounts, depending on their respective ages, the youngest receiving a total of $13,000.
In Swillie v. General Motors Corporation, 133 So.2d 813 (La.App. 3rd Cir. 1961) the decedent was 29 years of age with earnings of approximately $3,600 per year. This court affirmed an over-all jury award of $80,000 to a widow and two children, but redistributed this amount so as to grant the widow $46,000 and the children $16,000 and $18,000 respectively.
In Renz v. Texas & Pacific Railway Company, La.App., 138 So.2d 114 where the husband was 48 years of age earning $4,200 annually as a carpenter, this court awarded the widow $12,500 for loss of love and companionship, plus $32,893.50 for loss of support, making a total of $45,393.50.
The trial judge or jury has great discretion in fixing the amount of the award in a personal injury or death claim. Awards in similar cases are relevant only to determine whether there has been an abuse of this discretion. Ballard v. National Indemnity Company of Omaha, Nebraska, 246 La. 963, 169 So.2d 64 (1964); Gaspard v. LeMaire, 245 La. 239, 158 So.2d 149; Lomenick v. Schoeffler, La., 200 So. 2d 127 (1967). Under all of the circumstances, we do not think these awards are so excessive as to constitute an abuse of the jury's discretion.
For the reasons assigned, the judgment appealed is affirmed. All costs of this appeal are assessed against the defendant appellant.
Affirmed.

On Application for Rehearing.
En Banc. Rehearing denied.
HOOD, J., is of the opinion that a rehearing should be granted.
NOTES
[1] For other authorities see 29 C.J.S. Electricity § 42, p. 1073 et seq.; 26 Am.Jur. 248, et seq.; Annotation, 69 A.L.R.2d 12-186.