307 So.2d 654 (1975)
Leo J. ETIENNE, Plaintiff-Appellant,
v.
HOME INDEMNITY COMPANY et al., Defendants-Appellants,
Aetna Casualty & Surety Company, Intervenor-Appellee.
No. 4765.
Court of Appeal of Louisiana, Third Circuit.
January 23, 1975.
Rehearing Denied February 24, 1975.
*656 Davidson, Meaux, Onebane & Donohoe by L. Lane Roy, Lafayette, for defendants-appellants-appellees.
Richard Kennedy, Lafayette, for defendant-appellee-appellant.
Ronald Dauterive, Lafayette, for plaintiff-appellee-appellant.
Howard W. Martin, Lafayette, for defendant-appellee.
Before HOOD, CULPEPPER and WATSON, JJ.
HOOD, Judge.
Leo J. Etienne claims damages for personal injuries sustained by him when a gin pole truck he was near came in contact with a high voltage electric wire. The suit was dismissed as to some defendants, but those remaining at the time of the trial were (1) James Broussard, driver of the truck; (2) Ralph Indest, d/b/a Woodward Indest, owner of the truck and the employer of Broussard; and (3) Home Indemnity Company, the insurer of Indest under a liability policy covering the truck.
Aetna Casualty & Surety Company, the workmen's compensation insurer of plaintiff's employer, intervened seeking reimbursement of the compensation benefits it paid to plaintiff.
The case was tried by jury, with the result that a verdict was rendered finding that defendant Broussard was negligent, that plaintiff was free from contributory negligence, and that plaintiff is entitled to an award of $40,000.00. Judgment thereupon was rendered by the trial court in favor *657 of plaintiff and against defendants Broussard, Indest and Home Indemnity Company, in solido, for the amount set out in the verdict. Judgment also was rendered ordering that intervenor, Aetna, be paid $12,609.58 by preference out of the amount awarded to plaintiff. Defendants Broussard, Indest and Home Indemnity Company appealed. Plaintiff also appealed, seeking only an increase in the amount of the award.
The issues are: (1) Was Broussard negligent? (2) Was plaintiff negligent, barring him from recovery? (3) Was Broussard an "insured" under the policy which Home Indemnity Company issued to Indest? (4) Should the amount of the award of damages be increased?
The accident occurred at about 10:00 A. M. on April 18, 1972, at the Bayou Vista substation of Central Louisiana Electric Company, Inc. (Cleco), in Iberia Parish. The truck, owned by Indest and being driven by Broussard, was being used to move a heavy steel frame from one part of the substation to another. The steel frame had been suspended above the ground by means of a metal cable attached to the boom of the truck, and while it was so suspended Broussard drove the truck forward toward the place where the frame was to be deposited. Plaintiff Etienne was walking behind the truck, holding the steel frame with his hands to keep it from swinging as it was being moved. While the parties were so engaged, the gin pole of the truck came in contact with a high voltage electric wire, with the result that an electric current flowed through the metal cable and the steel frame to plaintiff, causing the latter to suffer the injuries for which he now seeks to recover damages.
Cleco is engaged in the business of generating and selling electric power, and the Bayou Vista substation serves as a facility for distributing to customers in that vicinity a part of the electrical power generated by that company. The substation comprises an area of about five acres, all of which is enclosed by a fence. A large number of electrical devices, transformers and high voltage electric lines are located in that enclosure.
Before the accident occurred, Cleco entered into a working agreement with Valery J. Durand, a contractor, under the terms of which the latter was to erect a steel structure, known as a switch stand, at the substation and to install an electric switch on that stand. Cleco also entered into a separate working agreement with Indest, under the terms of which Indest was to furnish a gin pole truck, with a driver-operator, which truck was to be used in connection with the erection of the switch stand. No contractual relationship existed between Durand and Indest.
Indest regularly employed Broussard to drive and to operate the gin pole truck for him. Broussard reported to his employer about 7:00 A.M. on the day the accident occurred, and he was instructed to drive the gin pole truck to the Bayou Vista substation and to use it there to assist in erecting the switch stand. Broussard thereupon drove the truck to that substation, arriving there about 9:30 A.M.
Durand drove his own pickup truck to the substation that morning, taking with him in the truck plaintiff and plaintiff's brother, Leroy Etienne, both of whom were regular employees of Durand. Durand and his crew, consisting of plaintiff and his brother, arrived at the substation about the time Broussard got there.
Donald Cestia, an employee of and construction superintendent for Cleco, arrived at the substation shortly after the others had gotten there. Cestia at that time was driving a pickup truck owned by Cleco. The only persons at the job site when the accident occurred were plaintiff, Broussard, Durand, plaintiff's brother, and Cestia.
After Cestia arrived at the substation, he informed Durand, out of the presence of *658 the others, that the job entailed the erection of a steel switch stand and the installation of a switch on that stand. He pointed out to Durand the location of the steel frame which was to comprise a part of the stand, and the location of the concrete slab to which the steel frame was to be moved. Both of those locations were within the enclosure of the substation. Cestia warned Durand at that time that the entire substation was energized, and he cautioned Durand to be careful as he worked around the live wires in that area. After giving that warning to Durand, Cestia went to a point near the control house to check some blueprints, leaving Durand to supervise and carry out the work which had been pointed out to him. Durand then warned everyone present, including plaintiff and Broussard, that the entire plant was energized, and he cautioned them to exercise care as they worked in that area.
Durand, Broussard and plaintiff were familiar with substations such as this. They knew that there were many energized high voltage lines there, and all of them were aware of the danger associated with working near such lines.
Broussard, following Durand's instructions, positioned his truck near the steel frame, and Durand and his crew assisted in fastening the metal cable from the boom of the truck to that heavy frame. Broussard then, while standing outside the truck, manipulated the controls, causing the boom to lift the steel frame about one foot off the ground. Durand then told Broussard to drive the truck forward and to get into such a position that it could be backed up to the concrete slab upon which the frame was to be deposited. He told Leroy, plaintiff's brother, to go to the concrete slab to clean off the anchor bolts on that slab. And, he instructed plaintiff to walk behind the truck and to hold the steel frame steady so it would not swing as it was being moved.
Broussard then got into the truck and caused it to move forward slowly toward the concrete slab. Plaintiff walked behind the truck, holding the steel frame steady with his hands. As soon as the truck began moving forward, Durand walked over to the concrete slab to see if the anchor bolts were clean.
Broussard drove the truck a greater distance beyond the concrete slab than was necessary to get it into the proper position. After the truck had traveled a greater distance than was necessary and while it was still moving forward, the gin pole on that vehicle struck a high voltage line which was suspended from 25 to 28 feet above the ground. Although Durand was in sight of the truck, he was working on the concrete slab and was not looking in that direction as the truck was driven beyond the place which he had pointed out to Broussard. He testified, "I thought he was just going to drive up a few feet past the slab and stop and wait for orders or somethingwhen I realized what had happened it was over." Cestia could not see the truck at the time of the accident because he was on the other side of the control house. Leroy Etienne was not looking at the vehicle when the high voltage line was struck.

(1) Negligence of Broussard
The jury found that Broussard was negligent. Defendants, in arguing that the jury erred, contend that Broussard was merely following Durand's instructions, that he could not see the high voltage wires while in the cab of his truck, and that he had the right to rely on Durand or plaintiff to be on the lookout for and to warn him of energized electric wires.
Broussard admitted that Durand had warned him that all of the wires at the substation were energized and had cautioned him to be careful. He testified, however, that Durand had told him to drive the truck "up forward to get in position to back up to the slab," and that "he was going to guide everything." He stated that he expected Durand to tell him when *659 to stop, but that "nobody tell me to stop" before the gin pole of his truck struck the wire. Immediately after Broussard started moving his truck forward he noticed that Durand was not in the vicinity of the truck. He stated that he looked for Durand in his rear view mirror as he was driving forward, but that he did not see him, and that he nevertheless continued to drive forward. Broussard testified that he did not hear Durand tell plaintiff to walk behind the steel frame and steady it, and that he didn't know whether plaintiff or anyone else was doing that, although he "felt pretty sure that they would do it, cause they usually do it." We find that Broussard knew or should have known that Durand was not in a position to warn him of danger or tell him to stop before he struck an energized wire, and that he did not know whether anyone else was in a position to give him such a warning as he drove the truck.
Broussard knew that the gin pole of his truck extended high into the air, and that there were many energized high voltage wires in that area. He stated that he could not see the wires while he was in the cab of his truck. He knew that Durand was not around the truck after he started driving forward, and he did not know whether anyone else was in a position to warn him if the gin pole got near a high voltage line. Yet, he continued to drive the truck forward until the high line was contacted. Under those circumstances, we find that Broussard was negligent in failing to maintain a proper lookout for the dangerous high voltage lines which he knew were in that area, or in failing to bring his truck to a stop until he ascertained that someone else was maintaining such a lookout for him. Broussard's negligence in that respect was a proximate cause of the accident.

(2) Plaintiff's Alleged Contributory Negligence
The jury found that plaintiff was free from contributory negligence. We agree.
Defendants contend that plaintiff had a duty to maintain a lookout for electric lines for the driver of the truck, and that he was negligent in having failed to do so and to warn Broussard of the danger before the truck contacted such a line. Durand testified that plaintiff was serving as a "swamper" on the truck, and that as such he was "supposed to kind of help the truck driver watch where they're going." The evidence shows, however, that Durand did not tell plaintiff to maintain a lookout for high lines. He told him merely to hold the steel frame to keep it from swinging.
The steel frame was estimated to be from five to seven feet wide, and from ten to fourteen feet long. When it was hoisted off the ground, the cable apparently was attached to one end of the frame, and as it was being towed the bottom of the frame was about one foot off the ground, and the top of it was from eleven to fifteen feet above the ground. Durand estimated that the top of the steel frame was about four feet below the top of the boom as it was being transported. The top of the boom must have been at least 25 feet high because the evidence shows that the electric wire which was struck was 25 to 28 feet above the ground. Plaintiff Etienne stated that he "looked up there" for electric wires as he walked behind the truck steadying the steel frame, but that he did not see any such lines before the accident occurred. His view, however, was materially obstructed by the large steel frame which he was holding. He was on the ground immediately behind this frame which towered several feet above his head. The truck and frame were moving forward, and the only way plaintiff could have seen the electric wire was to look around the frame, since he obviously could not see over it. We think that accounts for the fact that he was unable to see the wire which was struck.
We do not believe that plaintiff was under a duty to maintain a lookout for obstructions in the path of the truck while it was moving forward, especially since he could not see ahead of the truck. He thus *660 was not under a duty to warn the driver in the event the truck approached an electric line. On the contrary, we think plaintiff had a right to rely on the assumption that Broussard would maintain a proper lookout and would not allow the boom of the truck to come in contact with a high voltage electric wire. In any event, Broussard certainly was not relying on Etienne to give him such a warning, since he did not know whether Etienne or anyone else was behind the truck or was in a position to give such a warning.
The issues presented in Barrios v. Service Drayage Co., 250 So.2d 135 (La.App. 4 Cir. 1971), are similar to those presented here. In finding that the plaintiff was not chargeable with contributory negligence, the court said:
"The record shows that plaintiff was well aware of the existence of the electrical power lines and that they carried high voltage current. He also knew that the tank was located beneath the wires. Logically, it follows that he must have realized that the boom would be somewhere near the wires during the operation. However, it is not an assumption of the risk per se to work in the vicinity of high voltage electricity nor is it negligence per se."
* * * * * *
"A person does not have to anticipate the negligence of a co-worker. Ford v. Tremont Lumber Co., 123 La. 742, 49 So. 492 (1909). He may assume that others who owe him a duty of care will exercise that care and that he will not be exposed to nor threatened by danger which can come to him only from breach of that duty of care. Allien v. Louisiana Power and Light Co., 202 So.2d 704 (La.App. 3rd Cir., 1967); Vogt v. Hotard, 144 So.2d 714 (La.App. 4th Cir., 1962)."
The burden of proof rests on defendants to prove contributory negligence on the part of plaintiff. We are convinced that plaintiff was not negligent. We hold, therefore, that there is no error in the jury verdict finding that plaintiff was free from contributory negligence.

(3) Insurance Coverage
Defendant, Home Indemnity Company, contends that the automobile liability policy which it issued to Indest does not cover this accident because the policy specifically excludes coverage for injuries sustained by one employee caused by a fellow employee. The exclusionary clause referred to by that defendant provides that:
"None of the following is an insured:
"(i) any person while engaged in the business of his employer with respect to bodily injury to any fellow employee of such person injured in the course of his employment;"
It is argued primarily that Broussard and Etienne were fellow employees of Durand when this accident occurred, and that Broussard thus is not an insured under the policy. Etienne, of course, was a regular employee of Durand, but Broussard was regularly employed by Indest. The insurer contends, however, that Broussard was an employee pro hac vice, or a borrowed employee, of Durand when this accident occurred, and that Broussard thus was a fellow employee of Etienne, as that term is used in the above exclusionary clause.
By stipulation of counsel, the issue of whether Broussard was a borrowed servant of Durand was submitted to the trial judge for decision. The trial judge found that Durand had no right to control Broussard on this job, that he merely told him "what he wanted moved, and where to move it," that Durand did not intend to assume control of Broussard, and that Indest did not intend to relinquish control over him. He concluded that Broussard was not the borrowed employee of Durand.
There is a legal presumption that the general employer (in this case, Indest) retains control over his regular employee (Broussard). A party who alleges or contends that the employee has become the borrowed servant of another bears the burden *661 of proof. He must establish by a preponderance of the evidence that the right of the general employer to control the employee has terminated, and that the right to control him has been assumed by the borrowing employer. A mere showing of a division of control is not sufficient to meet this burden of proof. Pagitt Well Service, Inc. v. Sam Broussard, Inc., 293 So.2d 631 (La.App. 3 Cir. 1974); Barrios v. Service Drayage Co., supra; Benoit v. Hunt Tool Co., 219 La. 380, 53 So.2d 137 (1951).
In the instant suit Indest testified that Broussard had been working exclusively for him for more than 20 years, that he pays Broussard's salary, that he alone has the right to fire him, that Broussard remained under his control while working at the Bayou Vista substation, that he instructed Broussard as what to do that morning, and that no one else had the right to move him from one job to another. We think the other evidence in the record supports this testimony of Indest.
We agree with the trial judge that Broussard was not an employee pro hac vice, or a borrowed servant, of Durand at the time of the accident.
Defendant Home Indemnity Company argues, alternatively, that Broussard and plaintiff Etienne were "statutory employees" of Cleco, and that they thus were fellow employees at the time of the accident, excluding coverage under the Home Indemnity policy.
That issue was presented in a motion for summary judgment which was filed by Cleco prior to trial of the case on its merits. After a hearing the trial judge rendered a summary judgment dismissing the suit as to Cleco and its insurer, assigning as grounds therefor that "plaintiff's sole and exclusive remedy against Cleco is in workmen's compensation." He thus held, in effect, that plaintiff was a "statutory employee" of Cleco, in that LSA-R.S. 23:1032 and 23:1061 were applicable.
It is immaterial, we believe, whether plaintiff and Broussard were or were not so-called "statutory employees" of Cleco at the time of the accident. The issue to be determined here is whether they were "fellow employees" at that time, thus excluding coverage under the Home Indemnity policy. We have decided that the result would be the same regardless of whether they may be classified as "statutory employees," that is, whether they would be entitled to recover compensation benefits from Cleco under LSA-R.S. 23:1061 in case they sustained disabling work connected injuries.
LSA-R.S. 23:1061 provides:
"Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business, or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed.
"Where the principal is liable to pay compensation under this Section, he shall be entitled to indemnity from any person who independently of this Section would have been liable to pay compensation to the employee or his dependent, and shall have a cause of action therefor."
The sole purpose of that statutory provision is to prevent an employer from avoiding his compensation liability by interposing an independent contractor or sub-contractor between himself and his employees. See Wex S. Malone, Principal's *662 Liability for Workmen's Compensation to Employees of Contracts, 10 La.L.Rev. 25 (1949).
The language used in LSA-R.S. 23:1061 makes it clear that the person entitled to compensation benefits under that section is not an "employee" of the principal. If he were an employee of the principal, he would be entitled to benefits under other provisions of the act. The last paragraph of Section 1061 enables the principal to demand indemnity from the actual or real employer of the injured person. In arguing that Etienne and Broussard would have claims against Cleco under LSA-R.S. 23:1061 in case of injury, therefore, defendant necessarily must concede that they are not employees of Cleco. They thus could not be "fellow employees" of Cleco, excluding coverage of the accident under the Home Indemnity policy.
Our conclusion is that the above quoted exclusionary clause of the policy does not apply here, and that Broussard is an insured under the Home Indemnity policy. We find no error in the judgment appealed from condemning Broussard, Indest and Home Indemnity Company to pay the damages sustained by plaintiff Etienne.

(4) Quantum
Plaintiff contends that the award of damages made to him is inadequate and should be increased. Defendants contend that the award is reasonable and should not be disturbed.
The injuries which plaintiff sustained in this accident consisted of a fractured jaw, burns on his right arm and hand and burns on both of his legs and feet. Some of the injuries to his right arm and hand were deep second degree burns. Those on his legs were generally first and second degree burns, and some of the injuries to his feet, especially to his right foot, were deep third degree burns. He was hospitalized for 54 days, requiring surgery to his jaw and four surgical procedures on his feet. One of those surgical procedures involved the amputation of the fifth toe of plaintiff's right foot, and the removal of about one-half the fifth metatarsal bone of that foot. The injuries caused severe pain for several days after the accident, and he continued to suffer some pain while he was confined in the hospital.
The treatment administered to plaintiff was successful, and he recovered from all of his injuries within a period of about five months after the accident occurred. His treating physician felt that he had recovered sufficiently to return to the work he did previously by July 19, 1972. The two orthopaedic surgeons who examined plaintiff several months after the accident concluded that he then had a 15 percent permanent residual disability of his right foot. One of those physicians examined him in March, 1974, and felt that plaintiff could return to any kind of employment at that time, including hard manual labor, despite the above mentioned disability. The other orthopaedic surgeon felt that on June 26, 1973, or about nine months after the accident, he could return to work "of a lighter nature than heavy labor." The same physician examined plaintiff again on February 12, 1974, and found he was "improved" over the condition found about a year earlier. He expressed no opinion as to whether plaintiff could return to heavy manual labor at that time, but he stated that plaintiff's major complaint was that "he gets a burning discomfort in the scar tissue near the base of the fourth toe after standing on his foot for one and a half hours."
Etienne is 29 years of age. He is married and has three children. He attended school up to the tenth grade, and he has performed only manual labor. His salary or income at the time of the accident was $80.00 per week, or about $320.00 per month. He has not worked since the date of the accident. In April, 1973, however, or about one year after the accident occurred, he enrolled in a three year course *663 at a vocational training school, in which he is preparing himself for work as a skilled automobile mechanic. He is paid the sum of $334.00 per month by the Veterans Administration for enrolling in that course, and is assured that he will continue to receive that amount each month until he completes the three year period of schooling. He expects to earn a substantially larger salary after he completes that course than he did before he was injured.
Plaintiff's hospital and medical bills amounted to $6,359.58. His loss of earnings for about one year following the accident, assuming that he would have worked full time at the same salary during that time, adds up to about $4,000.00.
After considering all of the facts, we find that the award of $40,000.00 made by the jury and by the trial court as damages in this case was fair and adequate. We thus will not disturb that award.
For the reasons assigned, the judgment appealed from is affirmed. The costs of this appeal are assessed to defendants-appellants.
Affirmed.